(No. 71231.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT FAIR, Appellant.

*Opinion filed March 24, 1994.—Rehearing denied May 27, 1994.*

54

Rita A. Fry, Public Defender, of Chicago (Jeffrey M. Howard and Stephen L. Richards, Assistant Public Defenders, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook

County, defendant, Robert Fair, was convicted of the murders of Candace Augustus, and her 11-year-old son, Gregory. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1).) The same jury which convicted defendant determined that he was eligible for the death penalty based upon two statutory aggravating factors: (1) murder of two or more individuals (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)); and (2) murder of an individual under 12 years of age which resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7).) After the jury found no mitigating circumstances sufficient to preclude imposition of the death sentence, the trial judge sentenced defendant to death.

The defendant's sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the following reasons, we affirm defendant's convictions and death sentence.

## SUMMARY OF FACTS

The evidence at trial established that after the victim, Candace Augustus, failed to report to work on October 17, 1987, at the restaurant where she was employed, her co-workers became concerned. An employee from the restaurant notified Candace's mother, Mary Sieg, of her absence. Mary Sieg was alarmed because there had been some problems between Candace and defendant, who was her boyfriend at the time.

During the early morning hours of October 18, 1987, Candace's brother, Steven Augustus, and Mary Sieg drove to the trailer home in Dixmoor, Illinois, where Candace lived with her son Gregory. As they drove into the trailer park, Steven noticed that the trailer was dark and that Candace's car was missing. The door to the trailer was locked.

After receiving no response to his knock, Steven broke a window to enter the trailer. He entered his nephew's room and turned on the bedroom light. He looked on the bed and found the comforter in disarray with blood spattered all over the wall next to the bed. He pulled back the blanket and found the entire side of his nephew's head covered with blood. Because Gregory's body was cold to the touch, Steven believed him to be dead.

Steven then left Gregory's room and walked down the hallway into his sister's bedroom. He found Candace's lifeless body lying on her back across the bed, still clutching a pillow over her face. After she did not answer when he called her name, Steven telephoned the police.

Illinois State Police Investigator Dexter Bartlett, an evidence technician, processed the crime scene. Bartlett was found to be an expert in the field of blood-spatter and flight interpretation, which is a scientific formula used by crime technicians to measure through mathematics the velocity and type of instrument used to inflict an injury. The cast-off patterns found in Gregory's room revealed that he was struck with a bludgeoning weapon, such as a baseball bat. The blows leveled at Gregory's head were delivered with a high degree of impact, which caused his skull to break open. Bartlett found several pieces of skull and brain matter on the comforter which was removed from Gregory's head. Brain matter was also found on the bedroom wall and curtain. Because the victim was found lying on his left side in a very relaxed state, Bartlett opined that the victim was asleep at the time the attack occurred and never woke up. There was no apparent struggle or disturbance in his room. The amount of blood present on the baseball bat indicated that Gregory was the first victim bludgeoned to death.

Investigator Bartlett found Candace's body lying across the bed, with an aluminum baseball bat underneath her legs. After removing the pillow which covered Candace's head, Bartlett noted that her face and head were caved in and disfigured.

Brain matter which had emerged from the top of her head was smeared over her face. Candace had bruises on her hands and forearms. The blood spatter on the bedroom wall and ceiling indicated that the injury to the victim had been rendered by a blunt instrument. It was Bartlett's opinion that the injuries to both victims were consistent with being struck with a baseball bat with a high degree of velocity from the weapon itself.

While investigating Candace's room, Bartlett found an unsheathed knife on the top of the cable television box. Joseph Ambrozich, a forensic scientist and expert fingerprint examiner, conducted tests on the knife. Ambrozich found 12 points of comparison on the knife to defendant's fingerprints.

Dr. Robert Kirschner of the Cook County medical examiner's office performed the autopsies on the victims. Three blows, which were consistent with being struck with a baseball bat, resulted in the severe blunt trauma injuries to the head that led to Gregory's death. A gaping laceration on the right side of Gregory's head extended approximately eight inches from the rear to the front of the head. Multiple skull fractures were associated with the laceration. Dr. Kirschner noted extreme injury to several parts of the brain. Dr. Kirschner concluded that Gregory's death occurred almost instantaneously because the infliction of the wound on the right side of the head would have rendered him unconscious.

The autopsy of Candace also revealed severe blunt trauma injuries and lacerations to the head. The

autopsy showed partial tearing away of the skin from the scalp and multiple depressed skull fractures exposing the underlying brain tissue. The brain itself showed extreme injury, as the right frontal lobe was partially pulverized, and the left frontal lobe also had extensive damage. There were multiple bruises involving the upper facial tissues, bridge of the nose, and the right temporal region as well as extensive injuries to both the upper and lower lip. Bruises and injuries on Candace's left hand were defensive type injuries. The injuries to Candace were consistent with having been struck by a baseball bat approximately five times.

Officer Michael Morgan of the Dixmoor police department headed the investigation into the victims' deaths. Officer Morgan spoke with Lisa Renison, who also worked at the same restaurant where Candace was employed. Renison had spoken with Candace about her relationship with defendant. Candace and her son had known defendant for approximately 10 years, and at one time they lived together with him and his common law wife and children in California. About six weeks earlier, defendant "showed up" on Candace's doorstep upon returning to Illinois from California. Candace had taken defendant into her home because he had nowhere else to go. However, Candace did not want defendant in her home because he was not working, and she did not want her son to be subjected to his lifestyle. Renison believed that Candace was afraid of defendant. Renison knew that Candace was upset after work on the evening of October 16. Candace told Renison that she was going to tell defendant that she wanted him out of her house that night.

The Dixmoor police contacted defendant's common law wife, Linda Coslet, who lived in California. Coslet told the Dixmoor officers that defendant had some relatives in Coahoma County, Mississippi, in the vicinity

of Clarksdale. She also indicated that she was quite afraid of defendant and was not surprised that he could do something like this.

Officer Morgan spoke with the Coahoma County sheriff's office in Clarksdale, Mississippi. He learned that defendant was in the vicinity. Apparently, defendant told several relatives that he returned to Mississippi because he was involved in a murder in Chicago. Officer Morgan also discovered that defendant had a criminal background of armed robbery and theft.

On October 21, Officer Morgan and another Dixmoor officer drove to Mississippi. Upon their arrival, they spoke with several of defendant's friends and relatives. The officers left cards with those interviewed, and asked them to tell defendant to contact them at the Coahoma County sheriff's department.

In the early morning hours of October 23, defendant voluntarily walked into the Coahoma County sheriff's office. Defendant identified himself to Officer Gibson, the officer on duty at the time, and asked whether someone was looking for him. Deputy Gibson searched defendant around 1:45 a.m. in the lobby of the station. According to defendant, he was then placed in a locked detention room for 90 minutes until the Dixmoor officers arrived at the station. Defendant was advised of the *Miranda* warnings by the Coahoma County officers. He initialed a form which indicated that he understood those warnings. Defendant was not handcuffed, fingerprinted or photographed at that time, nor was he told that he was under arrest. The Coahoma County officers placed defendant in a waiting room and did not question him.

The Dixmoor police officers arrived at the Coahoma County sheriff's office around 3 a.m. The Dixmoor officers showed defendant the *Miranda* waiver which he had previously signed. The officers started the question-

ing by asking if he knew the reason why he was here, to which defendant replied that it was his understanding that it was for murder. He did not appear to be surprised when he was told that Candace and Gregory had been murdered. The interview between defendant and the Dixmoor officers was recorded on microcassettes. During these conversations, defendant denied having anything to do with the murders, repeatedly telling the officers that Candace and Gregory were "like family" to him and that he had raised Gregory as his own son.

During the first interview, defendant told the officers that he left Dixmoor by flagging a cab just outside the trailer park. Defendant stated that he had left some clothing inside Candace's trailer; however, Officer Morgan had not seen any evidence of defendant's belongings at the trailer. Defendant also said that he rode with a person named Tony Williams from Chicago to Memphis. He told the Dixmoor officers that he had visited a number of relatives in Friar's Point, Mississippi. While staying with his uncle, he learned the police wanted to talk with him. Because he did not want to bring trouble to his family, he left his uncle's house and hid for several days in the woods and abandoned buildings. Defendant also said that he wanted to know why the police wanted to talk with him and the evidence they had against him.

The questioning ended around 4:45 a.m. in the morning. Officer Morgan and the Coahoma County officers both told defendant that he was a suspect in the double murder and that he was going to be held at the station so that his story could be checked out and he could get some sleep.

Later that day, around 2:15 p.m., the officers again interviewed defendant following *Miranda* warnings. The interview lasted until 5:30 p.m., at which time defendant indicated that he was tired. After a brief rest, de-

fendant told the Dixmoor officers, "I did it. Sit down and I will tell you how I did it."

According to his statement, defendant had been having personal problems with Candace. On the evening of the murder, defendant was in the back bedroom lying down when he heard Candace arrive home around 12:30 a.m. He unlocked the front door to let her into the trailer. After changing her clothes, Candace and defendant began arguing about their personal life and defendant's wife, Linda, who was still in California. As the argument became more heated, Candace pulled out a hunting knife. Defendant was able to disarm her and placed the hunting knife on top of the cable television box.

The argument progressed, and, according to defendant, "things just got crazy." He walked into the living room and picked up Gregory's bat from a chair, went into the boy's room, and struck him three times with the baseball bat in the head. He left Gregory's room, placed the bat on the bathroom floor, and returned to Candace's room. Candace was sitting on the bed. Defendant knelt beside her and began to cry; however, she continued to curse him so he got up and retrieved the bat. Defendant then struck Candace four or five times in the head with the baseball bat.

Defendant walked into the living room, sat down in the middle of the floor, and cried. Defendant admitted that he did not know why he killed Candace and Gregory, for he loved and cared for both of them. However, things just "got out of hand." He got dressed, took the keys to Candace's car and the bag which he had previously packed, and left the trailer. After stopping for gas, cigarettes and coffee, defendant drove south on I-57. Although he was tempted to return at one point, he continued driving to Champaign, Illinois. He spent the night in a hotel and parked Candace's car in a parking

lot across the street. Later that afternoon he boarded a bus to Memphis and, eventually, another bus bound for Clarksdale, Mississippi.

Defendant indicated that the statement was made of his own free will, he had not been threatened or coerced, and no promises had been made to him. Defendant never requested an attorney, nor did he express a desire to stop the interview.

The next day, following *Miranda* warnings, defendant agreed to give a handwritten statement. Officer Morgan prepared the statement, which defendant signed after making a correction. At the same time that defendant signed the statement, he also signed an extradition waiver indicating that he wanted to return to Illinois with the Dixmoor officers. An Illinois warrant for defendant's arrest was obtained on October 24 at 12:30 a.m.

Assistant State's Attorney Sheila Devane interviewed defendant upon his return to Illinois. Defendant agreed to give his statement to a court reporter. That statement was substantially the same as the handwritten statement previously given to the Dixmoor officers. Defendant did not testify at trial.

At the close of the evidence and arguments, the jury returned a guilty verdict for the first degree murder of the two victims. The same jury found that defendant was eligible for the death penalty based upon two statutory aggravating factors: (1) murder of two or more individuals (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)); and (2) murder of an individual under 12 years of age which resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7)). After hearing the testimony of several witnesses at the sentencing phase of the trial, the jury found no mitigating factors sufficient to preclude the imposition of a death sentence. Accord-

ingly, the judge sentenced defendant to death for the murder of the two victims.

## PRETRIAL ISSUES

The first assignment of error concerns the trial court's denial of defendant's two motions to quash arrest. In the first motion, defendant maintained that he was arrested without probable cause when he first entered the Coahoma County sheriff's office between 1:30 a.m. and 2 a.m. on October 23, 1987. After hearing defendant's testimony, the trial judge denied that motion, finding that defendant voluntarily entered the police station and that no arrest occurred at that time. Defendant renewed the motion to quash arrest, alleging that the Mississippi authorities illegally arrested him without probable cause after 2 a.m., subsequent to an interview conducted by the Dixmoor police department. After the judge listened to the taped interview between defendant and the Dixmoor officers, and held another hearing, the second motion to quash arrest was also denied.

In essence, defendant contends that he was arrested without probable cause because circumstances which arose after he voluntarily entered the Coahoma County sheriff's office—*i.e.*, search and seizure of his belongings and person; repeated *Miranda* warnings; confinement in a locked room for 90 minutes; followed by a lengthy police interrogation—demonstrate that a reasonable person in defendant's position would not have believed that he was free to leave the police station.

Defendant correctly notes that factors considered in determining whether an arrest has occurred include: whether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave; the intent of the officer and the understanding of the arrestee; and whether the defendant was told he was free to leave or that he was under arrest. (*People v.*

*Holveck* (1990), 141 Ill. 2d 84.) The arrestee's understanding is not identical to the arrestee's subjective beliefs at the time of arrest; rather, the accepted test of understanding is " 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, quoting *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.

The Supreme Court further defined the meaning of "seizure" in *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, as set forth below:

> "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Mendenhall*, 446 U.S. at 553-54, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877, quoting *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 554, 49 L. Ed. 2d 1116, 1126, 96 S. Ct. 3074, 3081.

Application of the foregoing legal principles to the circumstances presented in the case *sub judice* leads to the conclusion that defendant was not placed under arrest when he first walked into the Coahoma County police station in the early morning hours of October 23. The record indicates that the Dixmoor officers arrived in Mississippi on the morning of October 22 and spoke with several of defendant's friends and relatives. The Dixmoor officers left cards with them, asking defendant to contact them at the Coahoma County sheriff's office. An individual's presence at a police station and responses to questions may still be voluntary even though requested by a police officer. *Mendenhall*, 446 U.S. 544,

64 L. Ed. 2d 497, 100 S. Ct. 1870; *Reid v. Georgia* (1980), 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 225, 36 L. Ed. 2d 854, 861, 93 S. Ct. 2041, 2046.

Defendant voluntarily walked into the police station. According to his own words, he wanted to know what the police "had on him." Defendant was searched upon his entry to the police station; however, it is reasonable to conclude that the search was conducted as a precautionary measure to ensure the safety of the officers who were also in the same room as defendant. Defendant was not handcuffed, fingerprinted, or photographed, which are the typical procedures that the public associates with an arrest. (*Wipfler*, 68 Ill. 2d at 167.) Defendant was never told that he was under arrest. At no time was defendant's freedom of movement restrained by a show of authority or by the use of physical force. Defendant was never told that he could not leave the station, nor did he ask if he could leave.

Although the Coahoma County officers read *Miranda* warnings to defendant, they did not question him regarding the murders of Candace and Gregory. The Dixmoor officers arrived at the police station approximately 90 minutes after defendant entered the police station and conducted the first interview with defendant. The first interview lasted approximately two hours, which is not an unusual length of time when we consider that the subject matter concerned a double homicide. After listening to the tapes of the interview, the trial judge found that it was held in a relaxed and noncoercive atmosphere.

We also find it significant that the evidence concerning whether defendant was actually placed in a locked detention room is controverted. According to Officer Morgan, upon his arrival at the Coahoma County police station at 3 a.m., defendant was in the "squadroom,"

which he described as a big room behind a waist-high counter. Morgan testified that the door that led into this area was open, and defendant was sitting in a chair behind the counter. Thus, the trial judge had the opportunity to evaluate the credibility of defendant as well as Officer Morgan as to whether defendant was actually placed in a locked detention room.

It is the function of the trial court to weigh the evidence and determine the credibility of the witnesses (*People v. Redd* (1990), 135 Ill. 2d 252), and we will not disturb that ruling unless that finding is manifestly erroneous (*People v. Gacho* (1988), 122 Ill. 2d 221, 234; *People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86). We find sufficient evidence in the record to show that defendant was not placed under arrest when he voluntarily entered the police station at 1:30 a.m. Rather, defendant's arrest was effectuated at 5 a.m. after he made several statements which the officers knew to be false, and the police told him that they wanted to hold him so that they could check out his story. Probable cause existed at that time because the police knew that defendant was in Dixmoor prior to the time the crime was committed and was absent thereafter; defendant's past criminal history of violence; and the fear of defendant expressed by his estranged wife as well as Candace's co-employee, Lisa Renison. In addition, defendant made incriminating statements to relatives in Mississippi and expressed uncertainty as to what information the police "had on him" when he first walked into the police station to surrender himself. Accordingly, we find that the trial court properly denied defendant's motions to quash arrest.

In a related issue, defendant contends that the trial judge erred by excluding evidence of defendant's subjective belief as to whether he felt that he was free to leave the police station. The component of an arrest

which courts have labeled the arrestee's understanding is not identical to the arrestee's subjective beliefs at the time of arrest. (*Wipfler*, 68 Ill. 2d at 166.) As previously stated, the accepted test of understanding is not what the arrestee thought, but "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.) In *Wipfler,* this court rejected the argument that an individual's subjective beliefs must be ascertained when they conflict with the "reasonable man" standard previously announced, even if such apprehension can be said to be reasonably held by the particular arrestee. (*Wipfler*, 68 Ill. 2d at 166.) In light of the evidence adduced at the hearing for the motion to quash arrest, it was not necessary for defendant to testify as to his subjective beliefs as to whether he felt free to leave the police station; as such, the trial court properly excluded such testimony.

## *BATSON* HEARING

Defendant next contends that the State engaged in purposeful discrimination when it exercised its peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. We note that defendant, an African-American, committed this crime against one Caucasian victim (Candace), and that her son Gregory was of mixed Caucasian and African-American descent. The record does not indicate the level of black representation on the venire.

During *voir dire*, defense counsel moved for a mistrial and a *Batson* hearing, based upon the prosecutor's use of six out of seven peremptory challenges to exclude black venirepersons. After the trial judge ruled that the defendant had made a *prima facie* showing of discrimination, the prosecution offered explanations for each of the six challenged strikes. The record reflects that out

of the eight jurors selected at that time, there were two black jurors currently sworn on the panel. At the conclusion of the hearing, the trial judge ruled that the explanations advanced by the State were sufficient to overcome the *prima facie* showing which defendant had made. Upon the continuation of *voir dire*, the State exercised its seventh peremptory challenge against an African-American venireperson. Defendant did not sound an objection at that time. The balance of jury selection continued and the third panel was accepted and sworn.

Defendant first argues that because the trial judge found that a *prima facie* case had been made, he should have required the State to explain the use of its final challenge to remove the seventh African-American venireperson from the jury. The State counters defendant's assertion by citing the well-established rule which states that challenges to the composition of a jury must be brought before the jury is sworn. See *People v. Evans* (1988), 125 Ill. 2d 50, 61-62; *People v. Gaines* (1981), 88 Ill. 2d 342, 359.

We agree with the State that defendant's failure to make a timely objection at trial to the prosecutor's peremptory challenge as required by *Batson* results in waiver upon review. (*Batson*, 476 U.S. at 99, 90 L. Ed. 2d at 89-90, 106 S. Ct. at 1724.) Defendant did not object at the time that the juror was excluded and allowed both parties to proceed with opening arguments and three State witnesses to testify before sounding his complaint. Defendant's acceptance of the empaneled jury implicitly demonstrated his satisfaction with those jurors. A defendant cannot wait until the trial is well underway before objecting to the jury composition in the hope of obtaining a mistrial.

Defendant next argues that the State's explanations for the exercise of its peremptory challenges were nei-

ther clear nor reasonably specific, and were therefore inadequate to rebut a *prima facie* case of racial discrimination.

Under *Batson*, once a *prima facie* case of discrimination has been established, the State has the burden of coming forward with a neutral explanation for excluding each black venireperson which is "related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) Once the State has come forward with its reasons for striking the venirepersons, the trial court must then determine whether the explanations are sufficient to rebut defendant's *prima facia* case. (*People v. Harris* (1989), 129 Ill. 2d 123, 174.) The trial court must make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case.' " (*Harris*, 129 Ill. 2d at 174-75, quoting *People v. Hall* (1983), 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75.) In reviewing the trial court's finding of whether the defendant established purposeful discrimination, we are mindful that a trial court's determination is a finding of fact and will not be overturned on review unless it is found to be clearly erroneous. *Hernandez v. New York* (1991), 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871; *People v. Andrews* (1993), 155 Ill. 2d 286, 293-94; *People v. Ramey* (1992), 151 Ill. 2d 498, 519.

On appeal, defendant challenges the State's exercise of peremptory challenges against five of the seven excluded African-American venire members. We address the State's proffered explanation for each excluded venire member in turn.

*Eric Crockett.* This 36-year-old venire member had completed only two years of his high school education. The State's rationale for excluding this juror was based upon the fact that he shared the following characteristics with defendant: Crockett was approximately the

same age as defendant, completed only two years of high school, and his mother was still living while his father was deceased. We find these characteristics distinguished Crockett from other venire members in a nondiscriminatory manner; thus, the State met its burden of providing a race-neutral explanation for exclusion of this juror.

In addition, the State believed that Crockett had difficulty understanding certain questions posed by the judge, which indicated his limited intellectual capacity. The State felt that Crockett would have difficulty comprehending the complex scientific evidence that would be presented at trial. Thus, the prosecutor felt that Crockett's demeanor also prohibited him from acting as a fair and impartial juror.

*Curtis Somerville.* The State peremptorily challenged this juror because he glared at the prosecutors in a derogatory manner. According to the prosecutor, Somerville sauntered into the courtroom, and slumped down in his chair. Upon the judge's initial questioning, he was holding his head up. Also, he was chewing gum with his mouth open while the trial judge questioned him. The prosecutor believed that these actions did not show proper deference toward the court.

Additionally, Somerville shook his head in response to the judge's inquiries in spite of the court's admonishments to answer "yes" or "no." Somerville's answers to inquiries about the death penalty were more soft-spoken than his answers to other questions. Finally, the prosecutor indicated that Somerville hesitated when asked if he could be fair to both sides. Based upon his demeanor, lack of maturity and deference toward the court, the prosecutor believed that Somerville would not be a fair and impartial juror.

*Tanya Brooks.* When asked by the judge to tell the court about her background, Brooks responded by

saying, "Do I have to do all that. There is nothing to tell." The prosecutor believed Brooks to be flippant and unsure in her responses, as well as youthful and immature. She appeared embarrassed to be in court. As the judge posed questions to her, she swung around in her chair. When asked whether she had any strong feelings toward the death penalty, Brooks laughed. Her responses to other questions were slow, and the prosecutor wondered about her comprehension of the questions posed to her. During the *voir dire* of another juror, she was sleeping in her chair. The prosecutor believed that her actions demonstrated her cavalier attitude about the jury selection process.

In summary, venire members Crockett, Somerville and Brooks were peremptorily challenged because of their demeanor. Defendant correctly notes that subjective explanations such as those presented by the State must be closely scrutinized because they can be easily used by a prosecutor as a pretext for excluding persons on the basis of race. (*Harris*, 129 Ill. 2d at 176.) Nevertheless, this court has consistently upheld the prosecutor's exclusion of a prospective juror on the basis of the individual's courtroom demeanor. (*People v. Hudson* (1993), 157 Ill. 2d 401, 433; *People v. Young* (1989), 128 Ill. 2d 1, 20; see also *Harris*, 129 Ill. 2d at 176.) In light of the fact that the trial judge is in the best position to observe the demeanor of potential jurors and evaluate their explanations, and given the deference accorded the trial court's ruling, we decline to disturb his ruling upon review.

*Diane Byas-Green and Carol Robinson.* The prosecutor exercised challenges against these two jurors because they appeared apprehensive about their ability to impose the death penalty.

Review of the record substantiates the State's explanation that these two jurors articulated a certain

level of discomfort with the imposition of the death penalty. Byas-Green indicated that she had strong feelings about the death penalty. When asked whether she would automatically vote against the death penalty no matter what the facts may reveal, she answered that she would "probably have to say yes." She later equivocated, and indicated that she would not automatically vote against a sentence of death regardless of the facts and circumstances of the case.

Carol Robinson also stated that she had strong feelings against the death penalty. She could not say if those feelings would prevent her from considering its imposition. Robinson said that she "didn't think" that her feelings would automatically cause her to vote against the imposition of the death penalty.

This court has consistently upheld prosecutor's challenges concerning the person's attitude toward the death penalty. (*People v. Howard* (1991), 147 Ill. 2d 103; *People v. Mack* (1989), 128 Ill. 2d 231.) The record supports the State's position that these particular venire members' views about the death penalty could potentially impact upon their ability to be fair and impartial jurors. We find, therefore, that the trial court correctly concluded that the State's reasons for challenging Byas-Green and Robinson on the basis of their attitudes toward capital punishment were legitimate and race neutral.

For the foregoing reasons, we find that there is no evidence of discriminatory intent in the State's explanation for the exclusion of Crockett, Somerville, Brooks, Byas-Green, and Robinson. Accordingly, the trial court's determination that the State's explanation was race neutral and sufficient to rebut the defendant's *prima facie* case was not clearly erroneous. (*Hernandez v. New York*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871; *Andrews*, 155 Ill. 2d at 294; *Ramey*, 151 Ill. 2d at 519.) Therefore, we reject defendant's *Batson* claim.

We next consider defendant's procedural challenge to the *Batson* analysis. Defendant contends that the trial judge erred by failing to make specific factual findings for each challenged strike during the *Batson* hearing, and instead confined himself to general assertions that the prosecutors had not engaged in racial discrimination. However, in *Mack*, 128 Ill. 2d at 245, we held that a similar oral ruling by a trial judge at the conclusion of a *Batson* hearing was sufficiently specific for our purposes, and that there was no further need for the trial judge to enter findings with respect to each black member of the venire excluded by the prosecution. Also, similar to the circumstances in the present case, the record in *Mack* contained the transcript of the explanations offered by the prosecutor. We therefore reject defendant's argument that specific findings of fact were required for each excluded juror.

Defendant's final assignment of alleged pretrial error concerns the trial judge's failure to admonish defendant pursuant to our Rule 402 (134 Ill. 2d R. 402). Defendant argues that defense counsel's concessions of his guilt throughout the trial effectively deprived him of the procedural due process safeguards required by *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (reversible error for the trial judge to accept defendant's guilty plea without an affirmative showing that it was intelligent and voluntary), and that Rule 402 admonitions should have been given to him because defense counsel's actions amounted to a plea of guilty to which he did not consent.

Defendant contends that the evidence of defense counsel's concession of his guilt is apparent from the following remarks made during opening statement:

> "DEFENSE COUNSEL: Any time there is a loss of life, whatever reason, it's tragic and it would be simpler if I could tell you that [defendant] was not there, but he was there.

It would be simpler if I could tell you that he didn't do this.

THE STATE: Objection, your honor.

THE COURT: Sustained.

DEFENSE COUNSEL: But the truth, the truth is that the evidence will show that [defendant] admitted that he was there and that he admitted that he killed Candace and Gregory.

* * *

The evidence will show that he was there and this happened, but as I said before, that is the simple part, because that part is brought to you in a statement that [defendant] signed. Those will be [defendant's] own words that he will tell you that."

Defendant principally relies on this court's decision in *People v. Hattery* (1985), 109 Ill. 2d 449, as support for his position that defense counsel's statements amounted to a guilty plea. The defendant in *Hattery* was charged with the murder of a mother and her two small children. During the opening statement, defense counsel made an unequivocal concession to the murder charge and defendant's eligibility for the death penalty; counsel stated that the only question in the case was whether the death penalty should be imposed. Throughout the trial, defense counsel advanced no theory of defense, presented no evidence of their own, made no closing argument or any attempt to hold the State to its burden of proof. Instead, through cross-examination of the State's witnesses, defendant attempted to demonstrate that defendant's actions were the product of compulsion.

In *Hattery*, this court held that where " 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.' " (*Hattery*, 109 Ill. 2d at 461, quoting *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047.) Moreover, "[c]ounsel may not concede

his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy." *Hattery*, 109 Ill. 2d at 465.

We find *Hattery* inapplicable to the case at bar because defense counsel *did* subject the State's case to meaningful adversarial testing. Defense counsel made numerous pretrial motions, including two motions to quash arrest and a motion to suppress statements. Counsel made an opening statement, arguing that while defendant may have been guilty of murder, he did not possess the requisite intent to support a conviction for first degree murder. Defense counsel cross-examined certain witnesses who were crucial to the State's case, including evidence technicians Dexter Bartlett and Joseph Ambrozich, Officer Morgan, and Dr. Robert Kirschner in keeping with his theory of the case. During the defense case in chief, counsel called Officer Morgan as a witness and questioned him about defendant's statement. In closing argument, defense counsel advocated that the evidence was insufficient to prove defendant guilty of first degree murder.

In short, this was not an instance where defense counsel conceded defendant's guilt and failed to provide an effective defense. Rather, defense counsel was placed in the precarious position of representing a defendant who had made statements implicating his culpability for the two murders, and where the evidence was overwhelming. "In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists." (*People v. Johnson* (1989), 128 Ill. 2d 253, 270. See also *People v. Ganus* (1992), 148 Ill. 2d 466, 473-74.) We conclude, therefore, that there was no need

for the trial judge to have admonished defendant pursuant to our Rule 402 (134 Ill. 2d R. 402). Counsel vigorously represented defendant, made no concessions of defendant's guilt on the charges of first degree murder, and subjected the State's case to meaningful adversarial testing.

Assuming, *arguendo*, that *Hattery* is applicable to this case, the record reveals that defendant consented to this strategy. As an initial matter, we note that defendant had an extensive criminal record, and therefore possessed familiarity with the criminal justice system. Following defense counsel's cross-examination of several of the State's witnesses, the trial judge granted the State's request to *voir dire* defendant, over defense counsel's objections, to see whether he agreed with defense counsel's strategy on his behalf. Defendant stated that he consulted with his attorneys prior to trial, and that he was advised of the results of the Rule 402 conference (134 Ill. 2d R. 402). At the time of the conference, defense counsel outlined their strategy in the case to him. He did not feel that he had adequate time to discuss the case with his counsel, nor did he discuss the content of the opening statement. Nonetheless, defendant indicated that he was in agreement with the defense strategy. The trial judge observed that although defendant's responses appeared to be intentionally evasive, he had been sufficiently apprised of the strategy of the case in accordance with *Hattery*. We will not disturb the trial judge's ruling that defendant knowingly and intelligently consented to defense counsel's strategy in the case.

For the foregoing reasons, we dismiss defendant's argument that admonitions pursuant to Rule 402 (134 Ill. 2d R. 402) were required under the circumstances presented in this case.

Defendant raises no issues concerning trial errors.

For the foregoing reasons, we affirm defendant's convictions.

## SENTENCING ISSUES

We now direct our attention to the numerous alleged errors which defendant contends occurred at the sentencing phase. We first consider defendant's contention that the trial judge erred by instructing the jury that defendant could be found eligible for the death penalty under section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7)). That section provides that a person convicted of murder may be eligible for the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7).

As a preliminary matter, we note that this court has held that section 9—1(b)(7) is not unconstitutional on its face. (*People v. Odle* (1988), 128 Ill. 2d 111.) Section 9—1(b)(7) specifically describes the conduct which qualifies an accused for the death penalty and is not susceptible to arbitrary application. (*Odle*, 128 Ill. 2d at 140.) This court emphasized that all of the qualifying elements must be present: the victim must be under the age of 12, and the conduct which brings about the victim's death must not only be exceptionally brutal or heinous, it must also be such that it is indicative of wanton cruelty. (*Odle*, 128 Ill. 2d at 141.) Subsequent challenges to this statute in light of the Supreme Court's decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, have also been upheld. See *People v. Lucas* (1989), 132 Ill. 2d 399, 444; *People v. Kidd* (1989), 129 Ill. 2d 432, 455-56.

Defendant submits that the medical testimony established that Gregory's death was caused by three severe blunt trauma injuries to his head. Defendant

speculates that the first blow rendered Gregory unconscious and probably killed him instantly. As such, he would be incapable of feeling pain, and was not subjected to prolonged torture. Therefore, defendant contends that there is no proof that Gregory's death was exceptionally brutal and heinous.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 501, this court had occasion to interpret the phrase "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty" (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)(b)). We held that the phrase must be given its ordinary and popularly understood meaning (*La Pointe*, 88 Ill. 2d at 499-500) and defined " 'heinous' " as being " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal' "; " 'brutal' " was held to mean " 'grossly ruthless', 'devoid of mercy or compassion: cruel and cold-blooded.' " (*La Pointe*, 88 Ill. 2d at 501, quoting Webster's Third New International Dictionary 1050, 286 (1971).) Cases in which this court has found brutal or heinous behavior to be present have generally involved prolonged pain, torture, or premeditation. See, *e.g., Odle*, 128 Ill. 2d 111; *People v. Mitchell* (1984), 105 Ill. 2d 1.

Although defendant's attack upon Gregory may not have been prolonged, it nonetheless comports with the established definition of brutal and heinous conduct. Police Investigator Bartlett testified that Gregory was asleep in his bed at the time defendant perpetrated the attack. Apparently, at some point during the verbal altercation with Candace, defendant left the bedroom and entered the living room to retrieve the baseball bat. He entered Gregory's room, and leveled three blows to his head. The force of those blows resulted in considerable amounts of blood and brain matter being spattered across the walls. Indeed, one blow was so severe that a gaping eight-inch wound was left in the side of the

sleeping boy's head. Gregory's skull was cracked open. According to Dr. Kirschner, there was extreme injury to several parts of the brain. Dr. Kirschner stated that the first blow rendered Gregory "at least unconscious and probably killed him instantly." Yet in spite of the fact that the first blow may have been sufficient to kill Gregory, defendant nonetheless inflicted two more blows to his head.

We find that defendant's bludgeoning of an 11-year-old boy with a baseball bat as he slept in his bed at night constitutes exceptionally brutal and heinous behavior indicative of wanton cruelty. Defendant's attack upon Gregory was without provocation, for he was not involved in any manner whatsoever with defendant's argument with Candace. Rather, he was an innocent child victimized by defendant's senseless and brutal violent conduct. The trial judge properly instructed the jury concerning defendant's eligibility for the death penalty under the section 9—1(b)(7) statutory aggravating factor.

In a related argument, defendant contends that the trial judge erroneously rejected his proffered instruction defining the terms "heinous," "brutal," and "exceptionally brutal or heinous behavior indicative of wanton cruelty." However, defendant's argument is premised upon his assertion that section 9—1(b)(7) is unconstitutionally vague, an argument which this court has consistently rejected. (See *Lucas*, 132 Ill. 2d at 444; *Odle*, 128 Ill. 2d at 140; *La Pointe*, 88 Ill. 2d at 501.) As explained in *La Pointe*, the words used in a statute shall have their ordinary and popularly understood meanings. (*La Pointe*, 88 Ill. 2d at 499.) We find that the words and phrases at issue were within the jurors' comprehension. Therefore, we do not find that it was improper for the trial judge to have refused defendant's tendered instructions.

Defendant next contends that the trial judge's response to the jury's written question concerning defendant's right to appeal either a sentence of death or natural life without parole improperly minimized the jury's role in the sentencing process in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 328, 86 L. Ed. 2d 231, 239, 105 S. Ct. 2633, 2639. During the jury's deliberations at the sentencing phase of the trial, four questions were sent from the jury. The first inquiry asked: "What are the legal options such as appeal available to the defendant in either instance [death or natural life without parole]?" After discussing the question with the prosecutor, and over defendant's objections, the trial judge responded in writing that, "You are not to be concerned with legal options in reaching your decision. If you reach a decision that would sentence a defendant to death, Illinois law provides automatic review by the Supreme Court."

In *Caldwell*, the prosecutor sought to rebut defense counsel's effort to impress upon the sentencing jury the enormity of a decision to impose the death penalty by informing the jury that such a decision would be subject to automatic appellate review. The trial judge failed to correct the prosecutor's remarks, and actually agreed with them by informing the jury that the remarks were proper and necessary, thereby implying that the prosecutor's portrayal of the jury's role was correct. The Supreme Court found it constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Caldwell*, 472 U.S. at 333, 86 L. Ed. 2d at 242, 105 S. Ct. at 2641-42.

While it may have been improper in the present case for the judge to have informed the jury that a death sentence would be automatically reviewable by the

Supreme Court, we do not find that that statement, in itself, misled the jury or served to diminish the responsibility of its role. After first admonishing the jurors that they were not to concern themselves with any legal options in reaching their decision, the trial judge merely responded to the jury's inquiry with an accurate statement of the law. The present case involves no prosecutorial misconduct or inaccurate arguments. Rather, review of the record reveals that both the prosecutor and defense counsel argued that it was the jury's decision to decide between life imprisonment and death. The jurors were asked to follow the law as instructed by the trial judge. Proper verdict forms clarified that it was the jury that must decide the question of whether the death sentence should be imposed. The jury was fully aware of its role in imposing the death penalty. Consequently, we conclude that the trial judge's answer to the jury's inquiry did not result in a *Caldwell* violation.

Defendant next asserts that the State was allowed to elicit improper testimony from Linda Coslet, defendant's common law wife. During cross-examination, the prosecutor asked her the following question:

"PROSECUTOR: Miss Coslet, you obviously have come a long distance to testify here. Would it be fair to say that up to a number [*sic*] about a year ago, you believed that the appropriate punishment for your commonlaw [*sic*] husband was the death penalty?

DEFENSE COUNSEL: Objection, relevance.

THE COURT: Overruled. You may answer.

COSLET: I believe in the death penalty, yes."

Defendant contends that since Coslet was his chief mitigation witness, this unfair attack on her credibility was damaging to his defense.

In *People v. Caballero* (1989), 126 Ill. 2d 248, the defendant claimed that his attorney failed to introduce the mitigating testimony of several potential witnesses solely because they were not categorically opposed to

the death penalty in all situations. As noted by this court, however, it is questionable whether a mitigation witness' opinion of the death penalty is relevant at a death penalty hearing. (*Caballero*, 126 Ill. 2d at 277.) This court has found that such evidence is not reliable or relevant, and that " 'it is wholly without value to the trier of fact in reaching a decision.' " *People v. Stewart* (1984), 105 Ill. 2d 22, 67, quoting E. Cleary, McCormick on Evidence § 12, at 26-27 (2d ed. 1972).

Although the State's question to Coslet concerning her attitude toward the death penalty may not have been relevant, we do not find that this inquiry was unduly prejudicial to defendant. Coslet never stated that she held the view that defendant should receive the death penalty; instead, she only indicated that she believed in the death penalty. The State did not refer to this testimony in closing argument. Any error which may have occurred concerning this question is harmless under the circumstances.

The next assignment of error concerns the exclusion of evidence that defendant was addicted to cocaine at the time of the murders. During Coslet's testimony, the trial judge sustained objections to defense counsel's question as to whether she believed that defendant had become addicted to cocaine. Similarly, objections were sustained during the testimony of Dr. Ali, a forensic psychiatrist who examined defendant in May and June of 1988, concerning the effects of cocaine upon defendant and whether he told Dr. Ali that he had become addicted to cocaine while he was in California. Defendant contends that these alleged errors were prejudicial to him, for if the witnesses had been allowed to testify that he had become addicted to cocaine, it might have explained the otherwise inexplicable killings of Candace and Gregory. Defendant also submits that the jurors' request to review Dr. Ali's evaluation of defendant

during jury deliberations suggests that they were considering whether defendant's extreme emotional disturbance outweighed the factors in aggravation introduced by the State.

We initially note that defendant never contended that he was under the influence of or addicted to cocaine at the time that he committed the murders. During defendant's first interview with Dr. Ali, he stated that he was not under the influence of any drugs on the night of the murder. In defendant's second interview with Dr. Ali, he told him that he drank some alcohol and took a pill of "speed" on the night of the murders; however, there was no mention of cocaine usage. Coslet testified that she spoke with defendant after he returned to Illinois, and he told her that he no longer used cocaine. Dr. Ali testified that defendant told him that the last time he used cocaine was four months prior to his return to Illinois. It appears, therefore, that the relevance of such opinion testimony is questionable in light of the evidence introduced at trial which showed that upon his return to Illinois in August, until the time of the murders in mid-October, defendant had not used cocaine.

Nevertheless, it is well established that a lay witness may give his opinion regarding the mental condition of an individual based on personally observed facts, which must be stated in detail. (*People v. Wright* (1985), 111 Ill. 2d 128, 148-49, citing *People v. Smothers* (1973), 55 Ill. 2d 172, 174-75; *People v. Williams* (1967), 38 Ill. 2d 115, 123.) While it may have been improper for the trial judge to have sustained defense counsel's objection as to whether Coslet believed that defendant was addicted to cocaine, other facts adduced at trial demonstrated to the jury defendant's prior cocaine usage. The record indicates that Coslet testified that defendant's cocaine usage escalated while he lived in California. She also

testified that defendant began to deal in narcotics from their apartment and stole money from her in order to buy more drugs. The reason Coslet asked defendant to leave her home was because of his cocaine problem. Thus, the jury could consider as mitigation evidence the fact that defendant went from being an occasional to heavy user of cocaine; that he had become a dealer to bring in money and help support his habit; and that his drug usage had caused the breakup of his relationship with Coslet.

As stated, an objection was also sustained when Dr. Ali was asked if defendant had told him he was addicted to cocaine while he lived in California. In *People v. Anderson* (1986), 113 Ill. 2d 1, 12-13, this court established that a psychiatric expert may testify as to statements made to him by the defendant which figure in his professional diagnosis, whether he is a treating or nontreating physician. However, as previously discussed, there was no evidence that defendant was under the influence of cocaine on the evening of the murders. As such, any error that may have occurred by the exclusion of the opinion testimony of Coslet and Dr. Ali is harmless under the circumstances.

Defendant further contends that the State improperly elicited testimony concerning details of Coslet's previous voluntary manslaughter conviction, which aroused the prejudices and biases of the jury against her. On direct-examination, Coslet was asked by defense counsel if at one time she was serving a prison sentence; if that conviction had been reversed; and whether she was found not guilty. Coslet responded affirmatively to these questions. On cross-examination, the State elicited testimony that Coslet had been convicted of the voluntary manslaughter of her husband, and that the facts at her trial established her husband had been shot once in the head and his body was buried in a shallow grave in

a cornfield. This court reversed the conviction and remanded for a new trial (*People v. Coslet* (1977), 67 Ill. 2d 127); however, the State never reprosecuted Coslet.

The State submits that defendant's failure to object to this testimony at trial results in waiver upon review. (*People v. Enoch* (1988), 122 Ill. 2d 176.) An exception to the waiver rule is provided by Rule 615(a) (134 Ill. 2d R. 615(a)), but that exception is expressly limited to cases in which the plain error affected substantial rights. Decisions of this court have consistently noted that, while the plain error doctrine may come into play when reviewing a sentencing hearing involving the death penalty (*People v. Szabo* (1983), 94 Ill. 2d 327, 355), issues which were waived will be addressed only when the evidence is closely balanced and will result in substantial injustice (*Gacho*, 122 Ill. 2d at 239; *People v. Garcia* (1983), 97 Ill. 2d 58, 86-87). Review of the evidence presented in aggravation and mitigation disposes of any contention that the evidence was closely balanced.

Defendant next contends that he was deprived of a fair sentencing hearing by the prosecutor's closing remarks to the jurors that they must put defendant to death *unless* they could unanimously agree that there was sufficient mitigation to preclude a death sentence. He asserts that such an argument misled the jurors to believe that they had to be unanimous in finding the existence of a mitigating factor or factors in order to preclude the imposition of the death penalty.

Section 9—1(g) of the Criminal Code of 1961 provides in relevant part:

"If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).

We find defendant's argument without merit. The prosecutor properly told the jurors that before the death penalty could be imposed, they had to unanimously

agree that there are no mitigating factors sufficient to preclude the imposition of the death sentence. In addition, the jury was properly instructed in accordance with section 9—1(g). Therefore, we find defendant's attempt to distort the meaning of the prosecutor's closing remarks to be unavailing.

Defendant further argues that testimony gleaned solely from defendant's prison records should not have been admitted in aggravation due to the unreliable nature of these records. Cameron Forbes, a supervisor in the Department of Corrections record's office, testified that, while previously incarcerated, defendant received 68 disciplinary violations, including violations for sniffing glue and homosexual activity. Based upon defendant's disciplinary record, Forbes concluded that defendant had made a dismal adjustment to the Department of Corrections' structured environment. Forbes further stated that after interviewing defendant, one prison counselor assessed that defendant has established few goals in life and visions little purpose other than self-gratification. That same counselor also opined that given defendant's criminal orientation, it is difficult to envision any extreme change.

In determining the admissibility of evidence during the aggravation/mitigation phase of the sentencing hearing, the only requirement is that the evidence be reliable and relevant. (*People v. Young* (1989), 128 Ill. 2d 1, 53; *La Pointe*, 88 Ill. 2d at 498-99.) The evaluation of the evidence's reliability and relevance lies within the sound discretion of the sentencing judge. *People v. Richardson* (1988), 123 Ill. 2d 322, 361-62.

Relevant and reliable evidence may be introduced during the second phase of the sentencing hearing even if it would be inadmissible, pursuant to the rules of evidence, during the guilt/innocence phase of the trial. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e).) Evidentiary rules

are waived at this stage because, in determining the appropriate sentence, the sentencing authority must possess the fullest information possible concerning the defendant's life, character, criminal record and the circumstances of the particular offense. (*People v. Patterson* (1992), 154 Ill. 2d 414, 476, quoting *People v. Brisbon* (1989), 129 Ill. 2d 200, 218-19.) This court has found that evidence containing hearsay is not *per se* inadmissible. *Young*, 128 Ill. 2d at 54.

Defendant's argument that his prison records should be inadmissible at the sentencing phase of trial is without merit. In *People v. Ward* (1992), 154 Ill. 2d 272, this court analyzed the introduction of a defendant's prison record at the sentencing hearing, and found that it met the threshold requirements of relevance and reliability. The testimony of the Department of Corrections official established that the records were kept in the ordinary course of business, during and after defendant's confinement in that penitentiary. To preclude the introduction of this type of evidence during the sentencing hearing would produce unnecessary hardship for the prosecution where, as here, the incidents occurred many years before the present charges. (*Ward*, 154 Ill. 2d at 330-31.) Locating the various persons with personal knowledge of the violations is often not feasible, and sometimes impossible. (See *United States v. Lewis* (7th Cir. 1990), 910 F.2d 1367.) We conclude, therefore, that defendant's prison records were properly admitted at the sentencing phase of trial.

Defendant's next contention of error concerns the admission of previous "bad acts," because there was no proof that defendant was ever charged with, or convicted of, these bad acts.

Dorothy Maples, who lived in the same apartment complex as defendant in California, testified during the

aggravation phase of the sentencing hearing about two incidents which involved defendant. Maples testified that in late 1986, her 10-year-old son came running into their apartment and told her that defendant had grabbed him by the shirt and picked him off the ground. Maples opened her apartment door, and saw defendant downstairs holding a baseball bat. When Maples asked defendant what had happened, defendant told her that he was "tired of this kid messing with my kids."

Maples further testified that several months later, defendant again knocked on the door to her apartment. He was holding his two-year-old daughter, who was covered with blood and crying. Defendant accused Maples' son Daniel of throwing a rock at his daughter. A heated argument ensued, and Maples' boyfriend went outside to fight defendant, who had armed himself with a baseball bat. Maples' boyfriend had no weapon when defendant tried to hit him with the bat. Defendant swung at Maples and her boyfriend with the bat, and struck her in the leg. Criminal charges were never brought against defendant for his involvement in these incidents.

As previously discussed, the requirement for the admissibility of evidence at the aggravation/mitigation phase of the sentencing hearing is relevance and reliability, which lies within the sound discretion of the sentencing judge. (*Richardson*, 123 Ill. 2d at 361-62.) Maples' testimony meets the relevance requirement because it reflected upon defendant's violent character. It demonstrated that he resorted to wielding a baseball bat as a weapon in previous altercations, just as he did when he committed the double murders in the present case. This evidence was also reliable given the fact that Maples observed defendant armed with the baseball bat after the first incident, and was an eyewitness to the second incident. We find no reason to disturb the trial

judge's ruling that Maples' testimony was both relevant and reliable.

Defendant next asserts that it was error to admit during the second phase of the sentencing hearing statements he had made to an Illinois Department of Corrections psychologist in 1965. Specifically, defendant contends that since the statements were given without first advising him of his *Miranda* rights, admission of those statements requires reversal of his sentence. However, defendant failed to object at trial or include this issue in his post-trial motion; as such, we find that the issue is waived. (*Enoch*, 122 Ill. 2d 176.) Because the evidence presented in aggravation and mitigation was not closely balanced, we decline to review this alleged error under Rule 615(a) (134 Ill. 2d R. 615(a)).

In his next assignment of error, defendant contends that he was deprived of a fair sentencing hearing by the introduction of life and morgue photographs of the victims at the sentencing hearing. The parties stipulated that all the testimony and exhibits which had been admitted during the trial would be readmitted into evidence. Defendant contends that the State improperly evoked the passions and prejudices of the jury through the introduction of the photographs of the victims during the eligibility phase of the sentencing hearing.

The State counters defendant's argument by contending that the issue is waived because defense counsel entered into a stipulation regarding the admission of this evidence. Also, defendant failed to sound a timely objection and include this issue in a post-trial motion. *Enoch*, 122 Ill. 2d 176.

We agree with the State that this issue has been waived. Moreover, as previously stated, we find that the evidence presented in aggravation and mitigation was not closely balanced. Therefore, we decline to review this alleged error under Rule 615(a) (134 Ill. 2d R. 615(a)).

Alternatively, defendant argues that defense counsel's stipulation to the admission of this evidence constitutes ineffective assistance of counsel. However, defendant has failed to show that, had these photographs not been admitted during the sentencing phase of the trial, a reasonable probability existed that the outcome of the sentencing hearing would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 527.) This is especially true when we consider that the jury had already viewed the photographs during the guilt/innocence phase of the trial. Accordingly, we do not find that defendant has demonstrated that defense counsel's actions meet the exacting standard set forth in the *Strickland* test, and that a different result would have occurred at the sentencing hearing.

Defendant further asserts that the prosecutor's arguments at the second phase of the sentencing hearing improperly included victim impact references. He complains that the prosecutor improperly argued during closing argument, "Well, there is one family that doesn't have to think about Sunday dinner anymore." Defendant also argues that the prosecutor's remarks that the victims were "real people," and that an 11-year-old boy should not have to worry about being struck with a baseball bat while he slept constitutes inappropriate victim impact testimony.

Defendant acknowledges that in *Howard*, 147 Ill. 2d 103, this court held that the Illinois Constitution does not forbid the introduction of victim impact testimony at a capital sentencing hearing. However, after closely examining the record, we are not persuaded that the complained-of remarks could even be considered as victim impact testimony. The prosecutor's remarks that because of defendant's actions in killing both Candace and Gregory, one family (Candace and Gregory) would

no longer be able to have Sunday dinner together does not reflect the effect the loss of those two individuals had upon other surviving family members, friends, and society. Nor do we consider it improper for the prosecutor to argue that the victims were real people who had everyday problems. Defendant's interpretation of the prosecutor's remarks as impermissible victim impact testimony is strained and meritless.

Defendant also contends that the trial judge erred when he refused defense counsel's request to reopen *voir dire* prior to the sentencing hearing. At trial, defense counsel requested that *voir dire* be reopened to see "if there are any prejudgment or preconceived notions as to what any one prospective juror may do." On appeal, defendant now expands that request to include asking the jurors about whether the fact that defendant had previous convictions would keep them from considering mitigating evidence.

We find no support for defendant's argument in the record. Defendant's nebulous assertion that *voir dire* should be reopened because the jury became prejudiced against him after it found him guilty must be rejected. Defendant failed to demonstrate to the court that good cause existed for discharging the jury that determined defendant's guilt, and that another jury should be impanelled. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(d)(2)(C).) Therefore, we dismiss defendant's argument as without merit.

As final sentencing issues, defendant also claims that the trial court denied his rights to due process and equal protection by not affording him the right of allocution at the death penalty hearing. Defendant acknowledges that in *Gaines*, 88 Ill. 2d 342, this court held that a defendant in a death penalty hearing does not have the right of allocution. (See also *People v. Williams* (1983), 97 Ill. 2d 252, 303; *Stewart*, 105 Ill. 2d at 74-75.) Defen-

dant also asserts that the trial judge improperly refused defense counsel's jury instruction listing nonstatutory mitigating factors, which this court has also previously rejected. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 40-41.) We decline defendant's invitation to revisit these holdings.

Similarly, we choose not to reconsider the issue of whether a defendant is denied a fair sentencing hearing at the second stage of the death penalty hearing when the State was allowed to give opening-closing and rebuttal-closing arguments at the close of evidence, which this court previously addressed in *Williams*, 97 Ill. 2d at 302. In *Williams*, this court held that a trial court at a death penalty hearing does not err in allowing the State to both open the arguments and close the final arguments with rebuttal, since the State is entitled to rebuttal time where it is the complaining party and has gone forward with the evidence. *Williams*, 97 Ill. 2d at 302-03, 134 Ill. 2d R. 233.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY

Defendant also raises a number of claims challenging the constitutionality of our death penalty statute. All of these claims have been rejected and reviewed in previous cases. We see no reason to reexamine the following arguments: (1) the death penalty statute places a burden of proof on the defendant which precludes meaningful consideration of mitigation (*People v. Bean* (1990), 137 Ill. 2d 65, 134; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465); (2) the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences (*Spreitzer*, 123 Ill. 2d at 44; *People v. Lewis* (1981), 88 Ill. 2d 129); (3) section 9—1(c)(2) of the statute which provides that "extreme mental or emotional disturbance" is a mitigating factor is unconstitutionally vague

(*People v. Silagy* (1984), 101 Ill. 2d 147); (4) the admission of hearsay testimony at the capital sentencing hearing violated defendant's right to confrontation (*People v. Holman* (1989), 132 Ill. 2d 128, 155); (5) the death penalty statute is unconstitutional for failing to require pretrial notice that the death penalty will be sought (*Evans*, 125 Ill. 2d at 99); (6) the statutory grant of discretion to the prosecutor in deciding whether to seek the death penalty in a particular case is invalid and unconstitutional (*People v. Orange* (1988), 121 Ill. 2d 364, 390; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43); (7) the death penalty statute is unconstitutional because it places the risk of nonpersuasion at the sentencing hearing on the defendant (*Bean*, 137 Ill. 2d at 138-40); (8) the failure of the death penalty statute to require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the death penalty violates the eighth and fourteenth amendments (*Stewart*, 105 Ill. 2d at 75; *People v. Brownell* (1980), 79 Ill. 2d 508); (9) the statute fails to provide sufficient information-gathering procedures to insure adequate appellate review (*Stewart*, 105 Ill. 2d at 75) or provide for proportionality review (*People v. Ashford* (1988), 121 Ill. 2d 55, 82-83); (10) the statute is unconstitutional because it does not provide a means to assure that all aggravating factors relied upon are relevant or constitutionally permissible (*People v. Perez* (1985), 108 Ill. 2d 70, 97); and (11) the statutory mitigating factor " 'no significant history of prior criminal activity' " is overly broad and vague (*Lewis*, 88 Ill. 2d at 144-46, quoting Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(1)). We reaffirm our holdings in those decisions today.

Defendant's last argument posits that based upon the Federal district court's decision in *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, the Illinois death penalty statute is unconstitutional because

the jury instructions allow the death penalty to be imposed in an arbitrary and capricious manner. However, the Seventh Circuit Court of Appeals has reversed that decision (*Free v. Peters* (1993), 12 F.2d 700). We find the reasoning employed in that decision to be sound, and therefore reject the argument that the jury instructions failed to pass constitutional muster. Defendant offers no persuasive reason to disturb that holding.

CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and death sentence. We direct the clerk of this court to enter an order setting Tuesday, September 13, 1994, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*