(No. 72742.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY ENIS, Appellant.

*Opinion filed September 29, 1994.—Rehearing denied January 30, 1995.*

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant, and Anthony Enis, of Pontiac, appellant *pro se.*

Roland W. Burris, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Arleen C. Anderson and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Based upon the evidence presented at trial, a jury in the circuit court of Lake County found defendant guilty of the murder of Merlinda Entrata that was committed on August 10, 1987, in Waukegan, Illinois. After a sentencing hearing, the trial court imposed the death sentence, which has been stayed pending direct review by this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a)). We affirm.

According to the evidence of record, Merlinda was the complainant in a criminal sexual assault charge that had been filed against the defendant for an incident that allegedly occurred on April 28, 1987, a few months before Merlinda was killed. Defendant entered a plea of not guilty to the charge. During the pendency of the criminal sexual assault proceeding, defendant was released on a personal recognizance bond. The case was originally set for trial on August 3, 1987, but was later continued to August 17 at the request of defense counsel.

Steven Simonian, an assistant State's Attorney who

met Merlinda in preparing the criminal sexual assault case for trial, believed that Merlinda was willing to proceed to trial and to testify against the defendant. Merlinda did not tell Simonian, or her victim assistance counselor, Chris Bellios, that defendant made any effort to contact her while he was released on bond.

In early May, Merlinda changed apartments at the complex where she had been living. She also bought long, wooden poles to prop against the doors to the apartment, to prevent forced entry into the apartment. Merlinda's uncle, Zacarias Meana, helped Merlinda move into the new apartment, and helped her install the wooden poles as additional security measures in the new apartment.

Merlinda was employed as a nurse at the American International Hospital. Before April 28, the date on which Merlinda was allegedly sexually assaulted by defendant, Merlinda had been working the 3 p.m. to 11 p.m. shift at the hospital. A few days after April 28, however, Merlinda requested that her shift be changed so that she would work from 7 a.m. to 3 p.m. This request was granted by the hospital administration. Carmelita Mangubat, who was also a nurse at the hospital and knew Merlinda from their mutual employment there, saw Merlinda on Sunday, August 9, at a birthday party for one of the hospital nurses. Mangubat expected to see Merlinda the next morning at work, but Merlinda never appeared.

Melena Powell, who lived in Merlinda's apartment complex, was awake in her apartment in the early morning hours of August 10, 1987. Powell heard two pop sounds and then heard someone run down the hallway. She got out of bed and walked toward the main door to the apartment. When Powell was about to open the door, she heard a girl say "mama, mama, mama" and then heard pop sounds. Powell also heard a sound

as if a body in the hallway was sliding against her door. Powell went to call the police. Before Powell was able to place the call, members of the police department arrived at the scene.

Patricia Secor, a dispatcher for the Waukegan police department, was working the midnight to 8 a.m. shift on August 10. At 6:46 a.m., she received a call of a shooting at the apartment complex. Both the ambulance and police were dispatched at 6:47 in the morning.

Steven Jones, a Waukegan police officer, heard and responded to Secor's dispatch call at 6:47 a.m. Jones arrived at the apartment complex at 6:49 in the morning. He went into the building, took the stairs up to the third floor, and found a young woman, later identified as Merlinda, slumped against a door in the interior apartment hallway. Jones checked her for vital signs, but she had no pulse. Jones notified communications of what he had found.

Officer Jones also took photographs and searched for fingerprints or other evidence of the crime. Jones found some bullet fragments near the victim's body. Later, the officer attended an autopsy that was performed on the victim. Jones saw that there was a total of five bullet wounds to the head. Some of the wounds had "stippling," which indicated the presence of unburned gunpowder and, in turn, that the gun had probably been fired from close range. Autopsy results established that Merlinda's death was caused by two of the gunshot wounds.

Officer Louis Rodriguez of the Waukegan police department was on patrol when the shooting occurred. He was called to the apartment complex to investigate and began to search for possible witnesses. During this investigation, he was given information regarding a white vehicle in the parking lot. Officer Rodriguez inspected the automobile and found the registration number. It belonged to the victim, Merlinda. He

searched the area and found a key ring near the apartment building in which Merlinda's body was found. It was later determined that the key ring also belonged to Merlinda.

The record indicates that police learned the following from persons who were at the scene at the time of the shooting.

## Clara Burk

Clara Burk, who lived in Merlinda's apartment complex, saw a man in the parking area of the apartment complex at approximately 9:30 p.m. on August 8, two days before the shooting. At the time, Burk was driving through the parking area. A man suddenly stepped off the curb in front of her car. Burk braked to stop so she would not hit the man. He immediately stepped back up onto the curb. He looked directly at her and waited. She motioned for him to move on, and he walked in front of her car and across the street.

Burk stated that when the man stepped back onto the curb, he looked at her and she looked directly at him. Her car lights were on and there were two street lights on in the area. The man was approximately five feet nine inches tall. He was of medium build and had closely cropped black hair. He was wearing white sunglasses.

Two days later, on August 10, 1987, Burk was driving in the parking lot at approximately 6:40 to 6:45 in the morning. She slowed because of automobile and pedestrian traffic. She looked over and saw the same man who had stepped off the curb in front of her car two nights earlier. The man had a lunch box, or some type of box, in his hand.

Burk saw a woman walk out of the apartment building. The woman was wearing a white uniform. Burk noticed that the woman was looking in her purse as she was walking down the stairs, and Burk watched

her for a little while because Burk thought she might fall and hurt herself. Burk saw the woman look up and noticed that a startled look came over the woman's face. The woman was looking straight ahead, in the direction of the man Burk recognized from the previous evening. The woman darted back into the apartment building, and the man ran after her. Burk heard two shots fired, and then heard one additional shot.

Burk was interviewed the following day by the Waukegan police department. She identified a photograph of the defendant, Anthony Enis, as the person she had seen on the evening of August 8 and on the morning of August 10. At that time, Burk did not give the officers any details regarding what she had seen. She explained to the officers that she was on her way to work and that she did not have time to give a statement. Burk gave the officers an address and contact number. A few days later, officers spoke to Burk at her place of employment. They showed Burk more photographs, and again Burk picked out a photo of the defendant. Burk also told the police what she had seen the evening of August 8, and what she had seen the morning of August 10.

Although Burk testified at defendant's trial that the man she saw was wearing sunglasses, she testified at a prior proceeding that she could not remember if the man was wearing sunglasses. Also, although she testified at defendant's trial that defendant had crossed in front of her vehicle when she saw him on the evening of August 8, police records indicated that Burk told the police that the man had passed behind her car, and that she had watched him in her rear-view mirror.

### Dan Thacker

Dan Thacker, who lived in Merlinda's apartment complex, was in his bedroom getting ready for work at about 6:30 a.m. on August 10, 1987. Thacker looked out his window and saw a woman in white clothing running

across the parking lot. Thacker went closer to the window to get a better look. He saw a man chasing the woman into one of the apartment buildings in the complex. Thacker stated the man was approximately 5 feet 10 to 5 feet 11 inches tall, with a "somewhat slender" build and a short haircut. The man was wearing white gloves, white sunglasses and dark clothing. He was carrying some kind of metal lunch box.

Thacker saw the man follow the woman into the building. A few minutes later, Thacker looked out the window again and saw the same man emerge from the building and walk across the parking lot. He was still wearing white gloves and white sunglasses and was still carrying the metal lunch box. Thacker looked at and watched the man as he walked in the parking lot. The man was walking in a direction toward Thacker, and he could see the front of the man's face and body, and a portion of his left profile.

Later, Thacker spoke to officers of the Waukegan police department. Thacker was shown various photographs, but could not make a positive identification of the man he had seen in the parking lot. However, Thacker did advise the officers that a photograph of the defendant matched the description of the man he had seen that morning. Thereafter, when Thacker saw a photograph of the defendant without facial hair, Thacker stated that he "wasn't a hundred percent positive identification, but it does meet all the features of the man that I saw."

A day after the incident, on August 11, Thacker saw a lineup. He chose one of the men, the defendant, as the person he had seen in the parking lot. Thacker again advised the officers that he "wasn't 100% positive, but [that] *** [defendant] met the general descriptions [of the person] that [he] saw that morning." At defendant's trial, Thacker identified defendant as the man whose

photographs he recognized as those of the assailant. Thacker also said that defendant was the man who "looks like the person that [he] saw on August 10, 1987."

Thacker acknowledged that he was not saying under oath that defendant was the man he saw on August 10, 1987. Thacker explained on cross-examination that the reason for his hesitation was not that he thought defendant might not be the same person, but because the assailant was wearing sunglasses, while the defendant was not.

## Richard Hanson

Richard Hanson, who also lived in the apartment complex, was at the entrance waiting for his car pool to go to work in the early morning hours of August 10. Hanson saw a man running toward him in the parking lot. The man was wearing white sunglasses and had on white gloves. Hanson was able to see the man clearly. As the man neared the hedges, the metal box that he was carrying came open. Hanson saw the man bend down and pick up whatever had fallen out of the box. Hanson saw that the item was a gun. Hanson saw the man put the gun back into the metal box. At defendant's trial, Hanson identified defendant as the man that he had seen that morning. Hanson said that he was certain of the identification.

The day after the shooting, Hanson was interviewed by a Waukegan police officer and told the officer what he had seen. When shown a photograph, Hanson identified the defendant as the assailant. Hanson also identified the defendant in a lineup. During cross-examination at defendant's trial, Hanson acknowledged that, in prior testimony, he had said that he could not be absolutely sure that defendant was the man, since the assailant had been wearing sunglasses. Hanson also explained, however, that in his prior testimony he also said that he was certain defendant was the man, but

"also made the comment that he did have on glasses, but to my recollection that was the person I saw."

### Sylvia Barrett

Sylvia Barrett was a passenger in a van that was entering the parking area of the apartment complex on August 10, 1987, at about 6:30 a.m. She was sitting in the front passenger seat of the van. When they entered the lot, Barrett saw a man in a dark-blue mechanic's jumpsuit. He was sitting in front of a car. Barrett and her companions sat in the van and waited for approximately three to five minutes. During this time, Barrett periodically looked over at the man. As they started to leave, the van drove directly past the man, and Barrett could see his face. The man looked away as though he was "trying to avoid anyone noticing him." Barrett could not recall if the man had been wearing sunglasses, or if he had been wearing gloves. Barrett positively identified defendant in court as the man she had seen sitting in front of the automobile.

Two days after the shooting, on August 12, Barrett was approached by police officers who showed her a group of photographs. She could not recall whether she recognized anyone from those photographs. Sergeant Paul Hendley of the Waukegan police department testified at defendant's trial that, when he spoke to Sylvia Barrett on August 12 and asked her if she recognized any of the photographs, she picked out the photograph of the defendant as the man she had seen. Barrett recalled that in February 1988, she was shown a photograph of the defendant, and that she identified him as the man she had seen in the parking lot on August 10.

Barrett also did not recall giving testimony in a prior proceeding that when she saw defendant in February 1988, she did not recognize him as the man she had seen in the parking lot and that he looked "basically

different" from the man she had seen in the parking lot. According to a transcript taken by the court reporter, Barrett testified at the prior proceeding that when she saw the defendant in February 1988, she did not recognize defendant as the man she had seen in the parking lot.

### John Twardy

John Twardy, who lived in the apartment complex, was having coffee in his bedroom at approximately 6:45 in the morning. He was sitting near the window, and could see the parking lot. As Twardy looked out the window, he saw a man running through the lot. The man jumped over a hedge, dropped something, stopped to pick it up, and then ran out of Twardy's line of sight. Twardy then saw a red car pull out of the parking lot and drive away.

Later that morning, Twardy was interviewed by officers of the Waukegan police department. Twardy told them what he had seen in the parking lot. A few days later, officers drove Twardy to an apartment building on South Jackson Street in North Chicago. Twardy told the officers that "this car was a little more shinier than what [he] *** saw when *** it [was] going up the hill" away from the apartment complex.

Twardy disagreed with information contained in police reports regarding Twardy's statements to officers following the incident. According to Twardy's testimony at defendant's trial, Twardy never told the officers that he saw the car pull away at a high rate of speed, and he never identified the car "without hesitation." He told the officers that the car was "shinier" than the one he had seen and that there was some damage to the right front fender that he had not noticed on the car he had seen pulling away. However, he never told the officers that he had seen the man enter the maroon vehicle, that it had four doors, or that it sped away.

Waukegan Police Officer Louis Marquez and Waukegan Detective Hendley interviewed Twardy after the shooting. The officers testified that Twardy told them that he saw a man run through the parking lot. The man was carrying a metal box. Twardy told the officers that he saw the man get into a maroon, four-door car that was parked near Twardy's automobile. Twardy said the man backed up very quickly; the man drove the car so fast that Twardy thought the man was going to hit Twardy's car. Twardy said the man sped out of the parking lot. Twardy told the officers that the car's right, front hubcap was missing. The officers took Twardy to look at a car parked on South Jackson Street in North Chicago. It was a maroon, four-door sedan with a right, front hubcap missing. Twardy said "without hesitation" that it was the car that he had seen speeding from the parking lot.

According to transcripts from earlier proceedings, Twardy had previously testified in court that the car he saw on South Jackson Street had a hubcap missing, the same one that had been missing when he saw it in the parking lot at the apartment complex.

At approximately 8 a.m. on the day that Merlinda was shot, officers of the Chicago and Waukegan police departments went to the apartment building on South Jackson Street in North Chicago where defendant had been living with his girlfriend, Diane Gonzales. The officers found a maroon, four-door sedan parked behind the apartment building. The officers touched the car and found that the hood was warm. The officers also noticed that there was no dew on the vehicle, although other cars that were nearby were still covered with morning dew. The four-door, maroon car was owned by defendant's girlfriend, Diane Gonzales.

The jury found defendant guilty of the murder of Merlinda Entrata. The defendant elected to have the

trial court determine the sentence he should receive. Following a sentencing hearing, the trial court imposed the death penalty.

## I

Defendant argues that the trial court erred when it refused to reconsider some of the pretrial orders that had been entered by the court. The procedural history of defendant's case clarifies the nature of the defendant's argument.

The jury trial, from which the present appeal is taken, was defendant's second prosecution for the murder of Merlinda Entrata. Defendant was previously convicted for the same crime and sentenced to death for that conviction. However, upon direct review, this court reversed and remanded for a new trial. (See *People v. Enis* (1990), 139 Ill. 2d 264.) The present appeal involves defendant's conviction and sentence following remand and a new jury trial.

In defendant's first appeal, defendant argued that the circuit court had made erroneous rulings on various motions *in limine.* He also claimed that the State improperly cross-examined him regarding Merlinda's accusation that defendant had sexually assaulted her. (See *Enis*, 139 Ill. 2d at 279-300.) This court found no reversible error in the trial court's *in limine* rulings. However, the court determined that the prosecution's cross-examination had been improper and deprived defendant of a fair trial. On this basis, the court reversed the defendant's conviction and remanded the cause for a new trial on the murder charge. *Enis*, 139 Ill. 2d at 300.

In his first appeal, defendant did not challenge the trial court's pretrial denial of the defendant's motions to quash his arrest and suppress evidence. On remand to the circuit court, defendant renewed his pretrial motions to quash his arrest and suppress evidence. The

trial court denied the defendant's request that the court reconsider its earlier pretrial ruling on these motions.

Defendant contends that the trial court's decision was in error. Defendant claims that the trial court should have allowed him a new evidentiary hearing on his motions to quash his arrest and suppress evidence. Defendant also argues that the court should have reconsidered its decision not to exclude evidence with respect to the sexual assault charges that had been filed against him.

We find no reversible error in the trial court's refusal to reconsider its earlier rulings that denied defendant's motions to quash his arrest and suppress evidence, or the court's denial of defendant's request to exclude evidence of the sexual assault charge filed against the defendant. The defendant could have raised these arguments in his first appeal, and his failure to do so justified the trial court's refusal to reconsider its rulings, under principles of collateral estoppel. Where a defendant's conviction has been reversed for trial error, and the cause is remanded for a new trial, the doctrine of collateral estoppel bars the relitigation of a pretrial ruling, such as a motion to suppress, unless the defendant offers additional evidence or there are other special circumstances. (See *People v. Holland* (1974), 56 Ill. 2d 318, 321-22; see also *People v. Armstrong* (1973), 56 Ill. 2d 159, 161; *People v. Hopkins* (1972), 52 Ill. 2d 1, 4-5; *People v. Brownell* (1984), 123 Ill. App. 3d 307, 312-14; *People v. Willis* (1979), 79 Ill. App. 3d 617, 620-21.) Special circumstances have been found where the defendant was acquitted of certain charges, thereby precluding him from seeking appellate review of the trial court's rulings. (*People v. Mordican* (1976), 64 Ill. 2d 257 (defendant who unsuccessfully challenged legality of his arrest, but was acquitted of the charge, may later raise same argument of legality of the arrest with respect to

separate charges also filed against him; acquittal prevented defendant from seeking appellate review of whether court properly denied his motion to quash arrest in first proceeding); *People v. Feagans* (1985), 134 Ill. App. 3d 252 (where appellate court reversed defendant's conviction and remanded for a new trial because of the State's failure to present a material witness at the hearing on defendant's motion to suppress his statements to authorities, circuit court could on remand hold new evidentiary hearing on defendant's motion to suppress the statements; doctrine of law of the case did not prevent trial court from holding a *de novo* evidentiary hearing); *People v. Sampson* (1980), 86 Ill. App. 3d 687 (similar facts to those in *Mordican*).) No special circumstances, such as acquittal, are presented in the present cause. Defendant does not suggest that he did not receive a full and fair hearing on his pretrial motions. Defendant points to no new evidence or legal precedent that would have been pertinent to the trial court's rulings on these matters. Also, we can find no special circumstances that would have warranted relitigation of defendant's pretrial arguments. Under these circumstances, there was no abuse of discretion in the trial court's refusal to revisit its rulings on these matters in preparation for defendant's second trial.

Defendant argues that the trial court has the inherent authority to reconsider and correct its own interlocutory rulings, citing *People v. Mink* (1990), 141 Ill. 2d 163, and *People ex rel. Daley v. Crilly* (1985), 108 Ill. 2d 301. In both of these cases, this court noted that a trial court retains jurisdiction to reconsider an order it has entered, as long as the cause is pending before the trial court. (*Mink*, 141 Ill. 2d at 171; see *Daley*, 108 Ill. 2d at 307.) The trial court's *power* to modify its rulings does not imply that the court is *obligated* to hold an additional evidentiary hearing in all instances. In the

present cause, the defendant provides no sound reason to warrant a second hearing on his pretrial claims. We note that this court's remark in defendant's first appeal that "we may have ruled differently if we had been the trial court" (*Enis*, 139 Ill. 2d at 281) did not pertain to the pretrial rulings which the defendant now claims should have been reconsidered by the trial court, but rather concerned the trial court's denial of defendant's request to introduce testimony of a witness whom defendant did not call to testify at his retrial.

## II

Defendant claims that the trial court should have excluded evidence that criminal charges had been filed against defendant accusing him of the sexual assault of Merlinda.

Although evidence of other criminal activity of the defendant is generally inadmissible, such evidence may be admitted where it is offered to prove the defendant's motive to commit the offense for which he is being tried. (*People v. Whalen* (1994), 158 Ill. 2d 415, 428-29.) The admission of evidence is a matter within the trial court's sound discretion and will not be disturbed on appeal absent a clear abuse of that discretion. (*People v. Illgen* (1991), 145 Ill. 2d 353, 364.) Here, the evidence of criminal sexual assault charges against defendant, accusing him of assaulting Merlinda, was offered to prove that defendant had a motive to murder her. Such evidence was highly relevant and probative to the State's case against the defendant, and was properly admitted by the trial court in the present cause.

## III

Defendant also asserts that the trial court erred when it denied his motion to quash his arrest and suppress evidence. In his motion, defendant claimed that he was arrested when police drove him from his

North Chicago residence to the Waukegan stationhouse at 10 a.m. on the day of the shooting. Defendant argued that the officers lacked probable cause to arrest him at that time.

During the first murder prosecution against defendant, the trial court held an evidentiary hearing on defendant's motion to quash his arrest and suppress evidence. At that hearing, defendant testified that he arrived at his home at approximately 10 a.m. on the day of the shooting. He was driving his motorcycle; his girlfriend, Diane Gonzalez, was with him. Defendant pulled into the alley and stopped his motorcycle. There were three detectives' cars in the alley and four or five policemen. As defendant was getting off his bike, the officers said, "Just the man we're looking for." The officers told defendant to get up against the brick wall of the garage in the alleyway. The officers then performed a pat-down search of the defendant. When defendant asked what they wanted, they replied, "We'll tell you about it when we get downtown." They also searched defendant's motorcycle. The detectives handcuffed the defendant and told him to get into the police car. Defendant testified that he did not resist because he did not believe that he had any choice. He stated that the officers drove him to the police station and put him in a room. When they left the room, defendant checked to see if the door was locked; it was. The defendant testified that the officers took his clothes and gave him "jail greens," and that they took his shoes and gave him "house shoes." Defendant stated that the officers told him that a girl had been killed and showed him pictures of the victim. When the officers advised defendant of his *Miranda* rights, he told them that he wanted to see his lawyer and that he had nothing to say.

Detective Lou Tessmann and Officer Richard Davis of the Waukegan police department testified that they

arrived at defendant's North Chicago residence at approximately 8:05 on the morning of the shooting. They knocked on the door to the home, but no one answered.

While the officers were waiting at defendant's residence, Officer Davis interviewed some of the neighbors. He learned from Laurie Gallen that she had seen defendant several times wearing white sunglasses while riding his motorcycle. Gallen identified a photograph of the defendant as the man to whom she was referring. She told Officer Davis that she could recognize the sound of defendant's motorcycle when it was started because it made a "whiny sound." Gallen told the officer that she heard the bike being started a little after 6 o'clock that morning. Officer Davis also spoke to Tanu Woods, who baby-sat for a family who lived near the defendant. Woods stated that she knew the defendant, that he rode a black motorcycle, and that she had seen him several times wearing white-rimmed sunglasses. She identified the defendant's photo as the man she was talking about. Officer Davis noticed that the hood of a maroon car in the alley, which they later learned was registered to defendant's girlfriend Diane, was still warm, as if the engine had just been running.

Detective Tessmann and Officer Davis testified that they were at defendant's residence when defendant and his girlfriend arrived at approximately 10 a.m. The two officers drove Diane Gonzalez to the police station. While they were driving to the police station, Diane told the officers that she and defendant had gone for a motorcycle ride, that she could not remember exactly where they had gone, that they had driven around the North Chicago area, and that they had come home to eat some breakfast. She said that they had been gone about an hour and a half. Detective Davis responded that they must have left around 8:30 that morning, and she agreed.

Waukegan police officer Phillip Stevenson testified that on August 10 at approximately 10 a.m., he was there when defendant and his girlfriend arrived at defendant's residence. Detectives Hendley and Tessmann and Officer Davis were also present. They identified themselves as police officers and told defendant that they needed to talk to him about an investigation they were conducting. The officers asked defendant and Diane if they would come to the station, and both agreed. They searched defendant and Diane for weapons. When asked, defendant agreed to a police search of the motorcycle. Defendant got into the squad car with Officers Stevenson and Hendley. They went directly to the Waukegan police department. Officer Stevenson testified that defendant was not handcuffed at any time and that the defendant agreed to accompany them to the stationhouse.

Officer Stevenson stated that defendant was placed in an interview room; the door to this room locked automatically. The officer testified that defendant was allowed to make phone calls and that he was provided with lunch and dinner. Officer Stevenson stated that defendant never said that he wanted to leave. The officer also stated that defendant's attorney came to the stationhouse, and that this attorney never indicated that defendant wanted to leave. When the attorney asked if defendant was under arrest, Officer Stevenson said that he was not.

Sergeant Paul Hendley of the Waukegan police department testified that he took defendant's photograph. Later, Sergeant Hendley asked defendant for his sweater and his clothing, and defendant gave them to the officer. According to Sergeant Hendley, defendant voluntarily gave his clothes to the officer for examination. The sergeant testified that he did not fingerprint the defendant, or book him, or make out an arrest card

for the defendant. Defendant was allowed to use the bathroom and the phone. Each time defendant left the room, he was escorted by a police officer.

Officer Stevenson said that on the morning of the shooting, the police had learned that witnesses described Merlinda's assailant as a man in his early twenties, approximately 5 feet 10 inches tall, with short hair. Officer Stevenson believed that this description fit the defendant. By 10 a.m., Officer Stevenson also knew that persons who had been at the scene described the attacker as wearing white sunglasses, and that people in defendant's neighborhood said they had seen defendant wearing white-rimmed sunglasses. There was no indication that Merlinda had been robbed, since her purse was still at the scene and the contents of her purse were intact. Officer Stevenson testified that one of the witnesses observed the man wearing sunglasses and dark clothing sitting on the curb between two cars, and one of those cars was Merlinda's. The car was the same one Merlinda had been driving when the assault occurred. She had been assaulted in the car.

Officer Luis Marquez testified that he spoke to Annette Glover at about 9:30 a.m. on August 10. She stated that she had left her apartment early that morning and walked to her car, which was parked in the lot. She started to put an object into her trunk when she saw a man sitting at the curb. He had a pair of white gloves, and was wearing dark clothing. Glover said that the man was also wearing white-rimmed sunglasses. However, Glover was not able to pick out this person from the photographs Marquez showed to her. Officer Marquez also spoke to Dan Thacker at 8:30 in the morning. Thacker was also unable to choose the person from photographs shown him at that time. Thacker also described the man as clean shaven with short hair, young, and about 5 feet 10 inches tall.

The trial court determined that the defendant was not under arrest at 10 a.m. on August 10 when he was driven to the police station and interviewed by authorities. In the alternative, the court found that the officers had probable cause to arrest him that morning. It was the province of the trial court to resolve the conflicts in the testimony offered at the hearing, to weigh the evidence presented, and to assess the credibility of the witnesses. (*People v. Redd* (1990), 135 Ill. 2d 252, 292-93; *People v. Galvin* (1989), 127 Ill. 2d 153, 163.) The trial court's determination should be affirmed upon review so long as it was not against the manifest weight of the evidence. *People v. Bernasco* (1990), 138 Ill. 2d 349, 368.

In *People v. Fair* (1994), 159 Ill. 2d 51, this court reiterated the criteria significant to determining whether a person has been placed under arrest. These factors include:

> "whether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave; the intent of the officer and the understanding of the arrestee; and whether the defendant was told he was free to leave or that he was under arrest. [Citation.]" *Fair,* 159 Ill. 2d at 66-67.

Evidence presented at the hearing supported the trial court's denial of defendant's motion to quash his arrest and suppress evidence. Officer Stevenson testified that defendant voluntarily accompanied the police to the stationhouse for questioning and that defendant was not under arrest when he arrived at the police station at approximately 10 a.m. on the morning of the shooting. Detective Hendley stated that defendant agreed to change his clothing and shoes so that defendant's could be examined by authorities. Defendant was not handcuffed, fingerprinted, or booked when he arrived at the police station. Defendant was allowed to leave the interview room and was given lunch and dinner. His attorney was summoned at defendant's request. When

this attorney asked if defendant was under arrest, he was told the defendant was not. Neither the defendant nor his counsel informed the officers at any time that defendant wanted to leave the police station. The patdown search for weapons, performed by the police before defendant was transported, is reasonably construed as a safety measure that was not intended as an incident of arrest. (*Fair*, 159 Ill. 2d at 68.) Although the defendant believed he was not free to leave, his subjective statements are not controlling in the inquiry of whether defendant was under arrest. (*Fair*, 159 Ill. 2d at 66-67.) In light of all of these considerations, the trial court's ruling was not against the manifest weight of the evidence.

Because we find no error in the trial court's determination that defendant was not under arrest when he went to the stationhouse at 10 a.m. on the day of the shooting, we need not and do not address defendant's argument that the police lacked probable cause to arrest him at that time.

## IV

Defendant argues that the identification testimony given by Clara Burk and Richard Hanson should have been suppressed because these witnesses were shown a single photograph of the defendant when they were questioned by police. Defendant contends that the procedure of showing the witnesses a single photograph of the defendant was impermissibly suggestive and tainted the witnesses' identification of him as the assailant. Defendant asserts that the erroneous admission of the identification testimony provided by Burk and Hanson deprived him of due process of law.

The record indicates that the trial court held a hearing, during defendant's initial prosecution for Merlinda's murder, on the defendant's motion to suppress the identification testimony of Burk and Hanson. At the

suppression hearing, Detective Lou Tessmann testified that he spoke to Clara Burk at approximately 6:40 a.m. on August 11, the day after the shooting. The detective stated that he was canvassing the neighborhood to find anyone who had seen something the previous morning. Detective Tessmann stopped Burk while she was driving her car out of the parking lot. He showed her a photograph of the defendant and asked her if she had ever seen the man. Burk replied that she had, and told him what she had seen the previous Friday evening. Burk told the detective that a man had been standing on the curb and walked out in front of her car. Burk also told Detective Tessmann that she waited for him to go by, but that the man also waited for her, so she drove past the man and observed him in the rear-view mirror as he crossed the street.

Burk told the detective that she was late for work and gave him her work phone number to talk to her further. Detective Tessmann spoke to Burk a second time on August 14 at 2:30 p.m. at the Fort Sheridan Military Base, where she was working. They discussed what she had seen on the previous Friday, as well as what she had seen the morning of the shooting. Then, at the close of the interview, the detective showed Burk five photos, one of which was that of the defendant. Detective Tessmann laid out each photograph and asked her to look at them to see if any of them was the man she had talked about. Burk looked at the photos for a few seconds and then picked out the defendant, stating, "This is the guy. There's no doubt in my mind." Burk said that when she saw the man the previous Friday, he had been wearing white sunglasses. Burk said that she could not remember if defendant was wearing the sunglasses on the morning that Merlinda was shot.

Burk also testified at the motion to suppress hearing. Her testimony was substantially similar to that provided

by Detective Tessmann. She stated that she told Detective Tessmann she had first seen the defendant the previous Friday at 9:30 p.m. She was driving out of the parking area at the apartment complex. The man stepped off the curb in front of her car. Burk said that she had her headlights on and they shined on him. She also said that there was street lighting in the area. When the man stepped in front of her car, she came to a halt. Burk said that she watched the man and that she got a good look at him. The man was wearing sunglasses. Burk said that the man stepped back onto the curb and hesitated. She waited for him and he crossed in front of her, passing through her headlights. Burk then drove past him, and again looked in the rearview mirror at him.

Burk testified that she also told Detective Tessmann that she saw the man again on Monday morning. He was standing in between two cars in the parking area. Burk also said that she noticed a woman wearing a white nurse's uniform coming out of the apartment building. The woman was looking in her purse and was not watching what she was doing. Burk saw the woman run back into the apartment building and the man run after her, going up to the building and in through the doors. Burk also noticed that the man was carrying a lunch box, although she could not remember what he was wearing.

Burk testified that she chose the photograph of the defendant because he was the person she had seen, not because it had been his photo a few days earlier that the detective had shown to her. She said that she was certain of her identifications of the defendant.

With respect to the identification of defendant by Richard Hanson, Detective Tessmann also spoke to Hanson at about 6:40 a.m. on August 11 in front of the apartment complex, during his canvas of the neighbor-

hood. The detective asked Hanson if he had seen anything the previous morning, and Hanson told him what he had seen. Hanson told the detective that he could make a positive identification of the man he had seen. Detective Tessmann showed him a photo of the defendant, and Hanson said, "That's the guy right there." Detective Tessmann asked him if he was absolutely sure, and he said, "There's no doubt in my mind. That's him." Hanson told the detective that the man had been wearing dark clothing, white sunglasses and white gloves. He said that the man was about six feet tall and weighed about 175 pounds. The man had been carrying a metal lunch box.

Detective Tessmann testified that he spoke to Hanson again at about 12:10 p.m. in one of the interview rooms at the Waukegan police station. The detective showed Hanson a report he had made of their conversation that morning. Hanson made corrections to the report with respect to what he had seen. The detective showed Hanson five photos, one of which was the defendant. Detective Tessmann stated that Hanson looked at the photos for about five seconds and then picked out the defendant.

Later that day, at about 2 p.m., Hanson viewed a six-man lineup. Detective Tessmann was present, as was defendant's attorney, who said he had no objections. Hanson identified the defendant as the man he had seen.

Hanson testified that Detective Tessmann spoke to him about 6:40 a.m. the day after the shooting at the apartment complex. The detective asked him if he had seen anything, and Hanson related what he had seen. This account was substantially similar to that provided by Detective Tessmann. Hanson said that he described the man as about six feet tall and 160 pounds, wearing white sunglasses and white gloves. Detective Tessmann showed him a photograph, and Hanson stated that that was the man he had seen.

Hanson stated that he had a second conversation with Detective Tessmann shortly after noon at the Waukegan police station. At that time, the detective showed him five photos, and he selected a photo of the defendant as the man he had seen. Hanson testified that a few hours later, he saw a lineup and identified the defendant.

Hanson stated that his identification of the defendant was based on his recollection of the defendant's complexion, height, and build. He testified that he had been certain of his identification of the defendant. Hanson testified that he identified the defendant because defendant was the man he had seen, not because he had seen photographs of the defendant.

We find sufficient circumstances to conclude that the identification testimony provided by Burk and Hanson was independently reliable and consequently admissible against defendant at trial. Generally, it is the defendant's burden to prove that a pretrial identification was impermissibly suggestive. (*People v. McTush* (1980), 81 Ill. 2d 513, 520.) The State may then overcome this showing by clear and convincing proof that, based on the totality of the circumstances, the witness is identifying the defendant based on his independent recollection of the incident. (*McTush*, 81 Ill. 2d at 520, quoting *Manson v. Brathwaite* (1977), 432 U.S. 98, 122, 53 L. Ed. 2d 140, 159, 97 S. Ct. 2243, 2257 (Marshall, J., dissenting).) To decide whether the witness' identification is reliable, the court must look to such factors as "the opportunity of the witness to view the assailant at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the offender, the level of certainty demonstrated by the witness at the suggestive confrontation, and the length of time between the offense and the suggestive confrontation. [Citation.]" (*People v. Williams* (1987), 118 Ill. 2d

407, 413; see also *People v. Cohoon* (1984), 104 Ill. 2d 295, 300.) Whether the witness was under any pressure to make a certain identification may also be significant. *People v. Bryant* (1983), 94 Ill. 2d 514, 521.

The trial court denied the defendant's motion to suppress. The court agreed with the defendant's argument that the officers' display of a single photograph to Burk and Hanson was improper and suggestive. The court determined that the burden therefore shifted to the prosecution to show that the identifications provided by Burk and Hanson were independently reliable. Based upon its review of the evidence presented at the suppression hearing, the court found that the State sustained its burden and proved that the identifications of the defendant provided by both Burk and Hanson were independently reliable and therefore admissible at trial.

The record in the present cause confirms the trial court's conclusion that the identifications provided by Burk and Hanson were supported by independent recollection and were thus reliable and admissible at trial. On the morning that Merlinda was shot, both Burk and Hanson saw the defendant during daylight hours and had sufficient opportunity to view him in order to see him clearly. Burk and Hanson stated that they were looking directly at the defendant while he was in the parking lot. Both Burk and Hanson gave authorities a description of the man they had seen, and both were certain of their initial identifications of the defendant. Burk and Hanson each testified that their identification of the defendant was based on their recollection of his appearance when they saw him, and was not based on their having seen a photograph of him when they were approached by Detective Tessmann on the morning of August 11, after the shooting. There is nothing in the record to suggest that Burk or Hanson felt compelled or

pressured to identify the defendant as the assailant. For these reasons, we conclude that the identifications made by Burk and Hanson were reliable and thus admissible against defendant at trial. See *Bryant*, 94 Ill. 2d at 521-22.

## V

Defendant claims that the eyewitness identification testimony did not establish his guilt beyond a reasonable doubt. In an appeal from a criminal conviction, it is not the function of this court to reweigh the evidence or determine anew the defendant's guilt. It is the province of the jury to assess the evidence against the defendant and to determine whether the State's evidence proved, beyond a reasonable doubt, that defendant was guilty of the offense for which he was being tried. Upon review, this court's role is limited to a determination, when viewing the evidence in the light most favorable to the State, that a rational finder of fact could have found that the prosecution proved, beyond a reasonable doubt, all of the elements of the crimes of which the defendant was accused. *People v. Kitchen* (1994), 159 Ill. 2d 1, 25, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Applying this standard to the evidence of record in the present cause, we conclude that the State's witnesses provided competent identification testimony that overwhelmingly proved the defendant's guilt in the murder of Merlinda Entrata. Clara Burk testified that she had seen defendant both on the morning of the shooting and a few days earlier, in the parking lot of the apartment complex. On the day of the shooting, Burk saw the defendant pursue Merlinda back into the apartment building. The man had short hair and was wearing white sunglasses and white gloves. Burk positively identified the defendant as Merlinda's assailant. Dan Thacker saw a man, whose description fit the

defendant, running across the parking lot. The man was running after Merlinda. Thacker said the man had short hair and was wearing white gloves, white sunglasses, and dark clothing. He was carrying a metal lunch box.

Richard Hanson stated that he saw the defendant running in the parking lot. As the defendant ran, his metal box fell open, and a gun fell out of the box. Hanson positively identified the defendant as the man he had seen. Hanson said the man was wearing white gloves and white sunglasses.

Sylvia Barrett stated that she saw the defendant in the parking lot on the morning of the shooting. He was sitting in front of a car, and was wearing a dark jumpsuit. Barrett positively identified the defendant as the man she had seen.

John Twardy stated that he saw a man run through the lot and then saw a maroon car drive away. Twardy identified the car of defendant's girlfriend, Diane Gonzales, as the car he might have seen that morning, although the car he had seen in the parking lot was "shinier" than the one Twardy saw later that was registered to Gonzales. Police found Gonzales' car parked outside defendant's residence a few hours after the shooting. They noticed that the hood of the car was warm and that there was no dew on the car.

State evidence also suggested that defendant had a motive to murder Merlinda, because she had accused him of sexually assaulting her a few months earlier. That prosecution was scheduled to begin just a few days before Merlinda was killed.

Reviewing all of this evidence in the light most favorable to the State, we find ample evidence from which the jury could have reasonably found defendant guilty beyond a reasonable doubt. The defendant had a strong motive to murder Merlinda, because of the pending criminal sexual assault charges filed against

defendant in which Merlinda was the complainant. Several witnesses positively identified defendant as the man they saw standing in the parking lot outside the apartment building where Merlinda lived, and stated that they saw defendant chase her back into the apartment building where she was shot moments later. There was also credible evidence from which the jury could reasonably conclude that a maroon car registered to defendant's girlfriend, Diane Gonzales, was driven from the scene to defendant's residence the morning of the shooting. The defendant complains that some of the witnesses were not absolutely certain that defendant was the man they saw on the morning of the shooting. However, these were defense arguments which the jury rejected. We can find no ground in the record to disturb the jury's determination of the defendant's guilt.

## VI

We next consider three of defendant's arguments that were not preserved at trial and therefore are grounds for reversal only if plain error occurred. First, defendant asserts that the prosecution was erroneously permitted to impeach John Twardy, a State witness, with prior inconsistent statements Twardy made regarding the car he saw drive away from the apartment complex the morning of the shooting. Defendant claims that this was error, because the testimony did not affirmatively damage the prosecution's case, and because the prosecutors were not surprised by the witness' testimony. Acknowledging that he failed to object at trial to the State's impeachment of Twardy's testimony, defendant argues that the improper State bolstering of Twardy's testimony amounts to plain error.

Plain error arises where the evidence is closely balanced or the error is so serious that it deprived the defendant of a fundamentally fair trial. (*People v. Johnson* (1994), 159 Ill. 2d 97, 120.) There was no plain

error in the State's allegedly improper impeachment of Twardy. First, based upon our review of the record, we cannot say that the allegedly improper impeachment in this case would amount to an error that deprived defendant of a fundamentally fair trial. Second, also based upon our review of the record, we do not believe that the evidence against the defendant was closely balanced. Three witnesses stated that they saw the defendant outside Merlinda's apartment building the morning she was killed. One of these witnesses saw defendant as he was running away from the apartment complex. This witness saw defendant drop a gun, pick it up, and put it back into a metal lunch box the defendant was carrying. A fourth witness stated that defendant matched the description of the person he had seen that morning. Defendant had a strong motive to murder Merlinda, since she had accused him of criminal sexual assault. Evidence suggested that defendant used his girlfriend's maroon car to drive away from the apartment building, and a resident of the apartment complex saw a man run from the building, get into a maroon car, and drive away. This evidence overwhelmingly proved the defendant's guilt.

As his second assignment of plain error, defendant contends that he should have been permitted to introduce evidence to show that Merlinda did not report the alleged criminal sexual assault until six days after its alleged occurrence. This argument was not raised in defendant's post-trial motion, and is waived for the purpose of review. (*People v. Enoch* (1988), 122 Ill. 2d 176.) The allegedly erroneous exclusion of the evidence did not deprive defendant of a fundamentally fair trial. Moreover, given the substantial evidence of the defendant's guilt as set forth above, we do not believe that any alleged impropriety in the exclusion of this evidence amounted to plain error. The result in defendant's

trial probably would not have been different, if the trial court had admitted the evidence which defendant sought to introduce.

Defendant argues that the State violated this court's Rule 412 by failing to disclose prior to trial that Merlinda's uncle, Zacarias Meana, would testify at defendant's trial. Rule 412 requires that, before trial begins, the prosecution must disclose the names of witnesses likely to be called by the State at trial. 134 Ill. 2d R. 412.

The record indicates that defendant objected to Meana's testimony before this witness took the stand at defendant's trial. In a sidebar outside the jury's presence, the State explained to the court the substance of Meana's testimony and its purpose to the State's case, which was to show that Merlinda had asked Meana, her uncle, to help her move into a new apartment and install wooden poles as security measures in the apartment. Defense counsel argued that Meana's testimony should be excluded because it was irrelevant to the State's case and unduly prejudicial to the defendant's defense at trial. The court overruled the defense objection and allowed Meana to testify.

We conclude that defendant's challenge to the admissibility of Meana's testimony because of a Rule 412 violation is waived upon review, since defendant did not raise the argument at trial. Also, because defendant was apprised of the substance of Meana's testimony before Meana testified, there can be no claim that this witness' testimony came as a complete surprise to the defendant. The alleged error with respect to Meana's testimony was not so egregious that it deprived defendant of a fundamentally fair trial. In addition, as set forth above, there was considerable evidence of the defendant's guilt. The alleged violation of Rule 412 did not, under these circumstances, amount to plain error.

We further consider defendant's argument, but find

no reversible error, with respect to the trial court's introduction of Meana's testimony in light of the arguments that defendant did raise and preserve at trial. Defendant claims that Meana's statements regarding the additional security measures he installed in Merlinda's apartment, at her request, bore no significance to the case against defendant. Defendant similarly contends that photographs depicting the security measures installed in Merlinda's apartment should have been excluded because they were irrelevant to the State's case and too prejudicial to his defense. We need not consider whether the trial court's admission of this evidence was an abuse of discretion. In light of the significant evidence of defendant's guilt, we do not believe that the allegedly improper introduction of Meana's testimony was a material factor in the determination of the defendant's guilt. Based upon our review of the record, we conclude that the allegedly improper introduction of this evidence did not deprive defendant of a fundamentally fair trial.

Defendant further argues that his trial attorney was ineffective for failing to properly preserve these defaulted claims for review on appeal. Specifically, defendant contends that his trial counsel was ineffective when he failed to object to the prosecution's impeachment of Twardy with his prior statements to Detective Marquez regarding the maroon car Twardy saw at the apartment complex the morning Merlinda was killed. Defendant asserts that his attorney was also incompetent when he failed to request a jury instruction to the effect that the impeachment of Twardy could not be considered substantively. Defendant acknowledges that his counsel sought and obtained such an instruction when the impeachment testimony was heard. However, defendant claims that his attorney should have requested that the jury be so instructed, a second time, at the close of all

the evidence. Defendant argues that his trial counsel was also ineffective for his failure to preserve the claim that the trial court erred in barring testimony that Merlinda did not complain about having been sexually assaulted until several days after the incident allegedly occurred.

In order to receive a new trial based on an allegation of ineffective assistance of trial counsel, a defendant must satisfy the two-prong test enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504. Under *Strickland*, the defendant must show that his attorney's performance fell below an objective standard of reasonableness. In addition, the defendant must prove that, but for the incompetence of his attorney, the outcome of defendant's trial probably would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Horton* (1991), 143 Ill. 2d 11, 23.) This court has reiterated that the "benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied upon as having produced a just result." *People v. Enoch* (1988), 122 Ill. 2d 176, 202.

Not every allegation of ineffective assistance of counsel requires that the court consider both elements stated in *Strickland*. Where the court can determine from the record that the alleged ineffectiveness of trial counsel, if proven, would not warrant a new trial, the court may dispose of the defendant's argument on that ground alone, and need not determine whether the defendant's counsel was, in fact, ineffective in representing the defendant. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Kitchen*, 159 Ill. 2d at

41.) We find such analysis appropriate in the present case, and do not reach the question of whether defendant's trial counsel was in fact incompetent in his representation of the defendant. Assuming *arguendo* such ineffectiveness, we do not believe that the outcome of the defendant's trial would have been different if defendant's trial counsel had done as defendant believes he should have at trial. As stated more fully above, the evidence of the defendant's guilt was overwhelming. In light of such substantial evidence of the defendant's guilt, counsel's alleged deficiencies did not so undermine the adversarial nature of the defendant's trial that one could question whether the result of the trial was fundamentally unjust. Consequently, defendant is not entitled to a new trial based on ineffective representation by his trial counsel.

## VII

Defendant complains that certain remarks made by the prosecutor during closing argument were improper and deprived him of a fair trial. Generally, the prosecution is accorded wide latitude in closing argument, provided the remarks are based on the facts in evidence or inferences from those facts. (*People v. Fields* (1990), 135 Ill. 2d 18, 64.) Therefore, "[w]hile a prosecutor may not argue assumptions or statements of fact which are not based on any evidence, he may properly comment upon the facts or upon legitimate inferences deduced therefrom. [Citation.]" (*People v. Edgeston* (1993), 157 Ill. 2d 201, 240.) As a general rule, reversal and remandment are unnecessary where the trial court has sustained a defense objection, thereby curing the potential for improper influence from the comment, especially where the jury is instructed that closing argument of the attorneys should not be considered as evidence in the case. *People v. Page* (1993), 156 Ill. 2d 258, 276.

First, defendant argues that the prosecution imper-

missibly relied on impeachment evidence as substantive proof. Specifically, defendant points to remarks made by the State in closing argument regarding the testimony of Twardy and Detective Marquez. The defendant's argument is not well founded. The prosecutor initially remarked that Twardy's testimony was "supplemented" by that of Detective Marquez. The defendant claims that this characterization was erroneous, because the detective's testimony impeached, but did not "supplement," some of the testimony given by Twardy. The trial court sustained defendant's objection at trial, thereby curing the erroneous statement. Thereafter the prosecution corrected its comments by stating that Twardy "testified regarding this and Detective Marquez also testified."

Defendant also claims that the prosecutor erroneously commented, "[A]s you heard from both Twardy and Marquez, a *** car, a maroon-type car is seen leaving [the apartment complex]. That car, that maroon car is Diane Gonzales' car." The prosecution also commented that this maroon automobile was "the car that Mr. Twardy saw leaving after the defendant dropped his box," and that it was "Diane Gonzales' car, the same car that was driven out of the complex that Mr. Twardy saw."

We find these remarks to be fair comment on the evidence presented at trial. Twardy testified that he saw a maroon car being driven from the apartment complex. Detective Marquez similarly testified that Twardy told him that he had seen a maroon car. Waukegan police officers found Diane Gonzales' car, which was maroon in color, parked outside defendant's residence a few hours after the shooting. The hood was warm, as though the engine had recently been running. We find no error in the prosecution's comments that the jury could reasonably infer that the maroon car seen by Twardy was the maroon car owned by Diane Gonzales.

Defendant asserts that the prosecutor made remarks during closing argument that improperly stated that defendant was guilty of having criminally sexually assaulted Merlinda, and that he would have been convicted if the case had gone to trial. In one instance, the prosecutor stated that Merlinda "came here from the Philippines to serve her American dream, to live her American dream" but that "on April 28, 1987, [she] *** began to suffer her American nightmare, a nightmare because it was on that date that she suffered a criminal sexual assault." Defendant's objection to this statement was sustained, and the court ordered the remark stricken from the record. By sustaining the defendant's objection and ordering the comment stricken, the trial court cured any prejudicial impact the comments might have had on the jury. On the record before us, we find the trial judge's efforts were adequate to ensure that the defendant received a fair trial.

The State also argued the substance of Assistant State's Attorney Simonian's testimony, saying that he "spoke to her by phone, in person, and he stated *** that she was cooperative. She was a woman who was cooperating with the authorities because she had had an injustice done to her." The defendant's objection was sustained. Once again, we conclude that the trial judge's decision to sustain the defendant's objection was sufficient to ensure that the defendant was not deprived of a fair trial because of the prosecution's remark.

Defendant also contends that the prosecutor improperly implied that defendant would have been found guilty of criminal sexual assault when the prosecutor told the jury that, on the day Merlinda was killed, the defendant was "14 days from when a conviction would result in a minimum 4 years in prison up to a maximum of 15 years in prison." In context, we do not believe that these remarks conveyed to the jury the impression that

the defendant would have been convicted, if he had stood trial. Rather, the remarks reminded the jury of the range of sentence that could have been imposed if the defendant had been convicted of criminal sexual assault. Further, if the remarks were improper, we do not believe that they were a material factor in the determination of the defendant's guilt, or that they were so egregious that they deprived defendant of a fair trial.

Lastly, defendant challenges certain comments made by the State during closing argument at the defendant's sentencing hearing. Specifically, defendant claims that the prosecution's several references to the Bible in advocating the imposition of the death penalty amounted to reversible error. The record reveals that the mitigation evidence offered by defendant included a letter from the defendant to the judge, which stated in pertinent part that the defendant had been a member of the Church of Christ since he was a young boy. The defendant's letter asked that the trial court follow the Biblical admonition to "[r]escue those being led away to death; hold back those staggering to slaughter" (Proverbs 24:11).

In response to defendant's references to his membership in a Christian church and defendant's reliance on Biblical scripture, the prosecutor questioned the defendant's sincerity in his religious convictions. The prosecution noted that the several criminal acts of which defendant had been convicted were not consistent with defendant's professed religious beliefs. The State quoted from several passages of scripture from the Bible to refute the reference made by defendant, and suggested to the court that defendant was the "proverbial" wolf in sheep's clothing.

In reply to these prosecution remarks, defense counsel also made numerous references to religious scriptures, including those in the Bible and the Talmud.

Defense counsel argued that these writings suggested forgiveness. Defense counsel asked that the court be lenient with the defendant and take into account his redeeming qualities.

The defendant contends that the prosecutor's references to Biblical scripture in seeking the death sentence were improper because they exceeded the evidence and destroyed the "objectivity and impartiality of the sentencer." However, the trial court's oral pronouncements reveal that the trial court was not persuaded to impose the death penalty because of Biblical scripture or the court's disbelief in the authenticity of defendant's religious convictions. Rather the trial court found the defendant should receive the death penalty because of the trial court's consideration of the evidence of record and the legal principles which the court was obligated and bound to follow. The trial court judge specifically stated as follows:

> "The defense counsel, the defendant, *** [the prosecutor] have all cited and quoted from scripture today. [Defense counsel] has said he is uncomfortable with what he says. I'm somewhat uncomfortable with that too. It's hard for me to envision that the Dear Lord is very happy about anything connected with this—with this crime, and anything that follows from it. I hope that we can all walk in peace with the Lord as [defense counsel] quoted to us after *** this is over today.
>
> My job is to follow the law, and my job is to do what's right under the law. I have carefully reviewed the factors in aggravation and mitigation. I have considered both statutory and non-statutory mitigation factors, weighed them fully and completely. And after reviewing everything, I find that there are no mitigating factors sufficient to preclude that the imposition of the death sentence be done in this case."

These remarks of the trial judge who imposed sentence demonstrate that the judge's decision was based on a full and careful consideration of the applicable law and

the evidence presented to him. Under these circumstances, there was no reversible error in the prosecution's references to Biblical scripture.

The defendant also argues that his trial counsel's failure to object to the prosecution's remarks amounted to incompetent legal representation by his trial counsel. Because we find that the trial court was not improperly influenced by the State's comments, we conclude that defendant is not entitled to a new sentencing hearing based on his ineffective-assistance-of-counsel argument.

## VIII

Defendant asserts that his eligibility for the death penalty was never proven beyond a reasonable doubt. We disagree. The evidence presented to prove defendant's eligibility for capital punishment convincingly demonstrated that defendant had murdered Merlinda because she was the complainant against him in a criminal sexual assault proceeding scheduled to go to trial less than a week before she was killed. A defendant is eligible for the death penalty where he has murdered the victim because the victim would have been a witness against him in a criminal prosecution. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(8).) The State in the instant cause proved defendant's eligibility beyond a reasonable doubt.

Defendant also argues that the State's failure to prove his eligibility for the death penalty beyond a reasonable doubt at the first death penalty hearing barred a second eligibility hearing, based upon principles of double jeopardy. Double jeopardy did not bar retrial of defendant's eligibility for capital punishment.

Principles of double jeopardy prevent an accused from being retried where the court of review has determined that the State presented insufficient evidence to prove his guilt beyond a reasonable doubt. (*Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1,

98 S. Ct. 2141; *People v. Ramirez* (1986), 114 Ill. 2d 125, 129.) In the instant cause, this court did not decide, in its initial decision to reverse defendant's conviction and remand for a new trial, that the prosecution had failed to sustain its burden of proving defendant's eligibility for the death penalty. (See *Enis*, 139 Ill. 2d 264.) Also, the defendant did not challenge the sufficiency of the State's evidence against him with respect to sentencing. Under these circumstances, double jeopardy principles did not act as a bar to the trial court's consideration of whether the defendant was eligible for the death penalty, once he had been retried and again convicted of Merlinda's murder.

## IX

Defendant asserts that the trial court denied him a fair sentencing hearing when it refused to limit the State to one closing argument. This court has rejected such a defense argument (*People v. Gosier* (1991), 145 Ill. 2d 127, 162; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03), and we decline defendant's invitation to revisit those earlier rulings.

## X

Defendant claims that the death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of evidence in mitigation. Defendant also claims that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk that a death sentence will be imposed arbitrarily or capriciously. This court has rejected these arguments in prior decisions, and we continue to adhere to that conclusion in the instant cause. *People v. Hampton* (1992), 149 Ill. 2d 71, 117; *People v. Simms* (1991), 143 Ill. 2d 154, 183-85; *People v. Phillips* (1989), 127 Ill. 2d 499, 542; *People v. Whitehead* (1987), 116 Ill. 2d 425, 462-65.

For the reasons stated above, we affirm the judgment of the circuit court of Lake County. We direct the clerk of this court to enter an order setting Wednesday, January 11, 1995, as the date on which the sentence of death entered by the circuit court is to be carried out. The defendant shall be executed in a manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Affirmed.*